McCONNELL et al., Appellees,

v.

HUNT SPORTS ENTERPRISES et al., Appellants.

[Cite as *McConnell v. Hunt Sports Ent.* (1999), 132 Ohio App.3d 657.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 98AP–1386 and 98AP–1459.

Decided Aug. 31, 1999.

*Zeiger & Carpenter, John W. Zeiger* and *Steven W. Tigges; Vorys, Sater, Seymour & Pease, L.L.P., Thomas B. Ridgley* and *David S. Cupps,* for appellees John H. McConnell and Wolfe Enterprises, Inc.

*Dinsmore & Shohl, L.L.P., Anthony J. Celebrezze, John W. Beatty, Joel S. Taylor* and *Wendy L. Andersen,* for appellants Hunt Sports Enterprises, Hunt Sports Enterprises, L.L.C. and Hunt Sports Group, L.L.C.

*Wiles, Boyle, Burkholder & Bringardner Co., L.P.A., Jay B. Eggspuehler* and *Mark C. Melko,* for appellant Columbus Hockey Limited, by its Liquidating Trustee, Michael L. Close.

---

TYACK, Judge.

On June 17, 1997, John H. McConnell and Wolfe Enterprises, Inc. filed a complaint for declaratory judgment in the Franklin County Court of Common Pleas against Hunt Sports Enterprises, Hunt Sports Enterprises, L.L.C., Hunt Sports Group, L.L.C. ("Hunt Sports Group"), and Columbus Hockey Limited ("CHL"). CHL was a limited liability company formed under R.C. Chapter 1705. A brief background of the events leading up to the formation of CHL and the subsequent discord among certain of its members follows.

In 1996, the National Hockey League ("NHL") determined it would be accepting applications for new hockey franchises. In April 1996, Gregory S. Lashutka, the mayor of Columbus, received a phone call from an NHL representative inquiring as to Columbus's interest in a hockey team. As a result, Mayor Lashutka asked certain community leaders who had been involved in exploring professional sports in Columbus to pursue the possibility of applying for an NHL hockey franchise. Two of these persons were Ronald A. Pizzuti and McConnell.

Pizzuti began efforts to recruit investors in a possible franchise. Pizzuti approached Lamar Hunt, principal of Hunt Sports Group, as to Hunt's interest in investing in such a franchise for Columbus. Hunt was already the operating member of the Columbus Crew, a professional soccer team whose investors included Hunt Sports Group, Pizzuti, McConnell, and Wolfe Enterprises, Inc. Hunt expressed an interest in participating in a possible franchise. The deadline for applying for an NHL expansion franchise was November 1, 1996.

On October 31, 1996, CHL was formed when its articles of organization were filed with the secretary of state pursuant to R.C. 1705.04. The members of CHL were McConnell, Wolfe Enterprises, Inc., Hunt Sports Group, Pizzuti Sports Limited, and Buckeye Hockey, L.L.C.[1] Each member made an initial capital contribution of $25,000. CHL was subject to an operating agreement that set

---

1. In its answer and counterclaim, Hunt Sports Group averred that Ameritech was also a member of CHL. Ameritech's name does not appear on Schedule A of the operating agreement; however, the record reflects that Ameritech contributed $25,000 to CHL and was considered a member of CHL. Ameritech's membership status is not an issue in this appeal.

forth the terms between the members. Pursuant to section 2.1 of CHL's operating agreement, the general character of the business of CHL was to invest in and operate a franchise in the NHL.

On or about November 1, 1996, an application was filed with the NHL on behalf of the city of Columbus. In the application, the ownership group was identified as CHL, and the individuals in such group were listed as Pizzuti Sports Limited, McConnell, Wolfe Enterprises, Inc., and Hunt Sports Group. A $100,-000 check from CHL was included as the application fee. Also included within the application package was Columbus's plan for an arena to house the hockey games. There was no facility at the time, and the proposal was to build a facility that would be financed, in large part, by a three-year countywide one-half percent sales tax. The sales tax issue would be on the May 1997 ballot.

On May 6, 1997, the sales tax issue failed. The day after, Mayor Lashutka met with Hunt, and other opportunities were discussed. The mayor also spoke with Gary Bettman, commissioner of the NHL, and they discussed whether an alternate plan for an arena was possible. Also on May 7, 1997, Dimon McPherson, chairman and chief executive officer of Nationwide Insurance Enterprise ("Nationwide"), met with Hunt, and they discussed the possibility of building the arena despite the failure of the sales tax issue. McPherson testified that he chose Hunt because: "Well, he was the visible, obvious, only person that was involved in trying to bring NHL hockey to Columbus. There was really no one else to turn to." Hunt was interested, and Nationwide began working on an arena plan. On or about May 9, 1997, the mayor spoke with Bettman and let him know that alternate plans would be pursued, and Mr. Bettman gave Columbus until June 4, 1997 to come up with a plan.

By May 28, 1997, Nationwide had come up with a plan to finance an arena privately and on such date, Nationwide representatives met with representatives of Hunt Sports Group. Hunt Sports Group did not accept Nationwide's lease proposal. McPherson told Hunt that City Council would be meeting on Monday, June 2, 1997, to vote on an ordinance that, in general terms, included an authorization for the city to enter into an agreement with Nationwide to build a downtown arena. Nationwide informed Hunt Sports Group that it needed an answer by Friday, May 30, 1997 as to whether, in general terms, the lease proposal was acceptable. On May 29, 1997, Nationwide representatives again met with representatives of Hunt Sports Group. Again, Hunt Sports Group indicated that the lease proposal was unacceptable and that the NHL team would lose millions with this proposal. The June 4, 1997 NHL deadline was discussed. Hunt Sports Group stated that it would continue to evaluate the proposal, and it wanted the weekend to do so. Nationwide informed appellant that it needed an answer by close of business Friday, May 30.

On May 30, 1997, McPherson called McConnell and requested that they meet and discuss "where [they] were on the arena." McPherson "could see that the situation now was slipping away, and [he] just didn't want that to happen," so he went to see McConnell for advice and counsel. McConnell testified that the conversation was "totally out of the blue. [McPherson] said that Nationwide was going to finance and build an arena, and that he had offered the Hunt group the opportunity to pick up the lease and bring a franchise in. That was news to me. It was out of the blue." McPherson told McConnell about appellant's rejection of the lease proposal and discussed the NHL's June 4 deadline. McConnell stated that if Hunt would not step up and lease the arena and, therefore, get the franchise, McConnell would. Hunt Sports Group did not contact Nationwide on May 30, 1997.

On Saturday, May 31, McPherson told Nationwide's board of directors that there was not yet a lease commitment but that if Hunt Sports Group did not lease the arena, McConnell would. On Monday, June 2, 1997, City Council passed the resolution that set forth the terms for Nationwide to build an arena downtown. Also on June 2, 1997, McPherson met with Bettman and told him that Nationwide would be building an arena in downtown Columbus. McPherson also told Bettman that if need be, McConnell would purchase the franchise on his own. On or about Tuesday, June 3, McConnell was informed that appellant had not yet accepted the lease proposal. On June 3, Hunt spoke with Robert J. Woodward, Jr., executive vice-president and chief investment officer of Nationwide, and asked him to fax a copy of the ordinance passed by City Council. On that same date, Hunt Sports Group told Nationwide that it still found the terms of the lease to be unacceptable. On June 3 or June 4, McConnell, in a conversation with the NHL, orally agreed to apply for a hockey franchise for Columbus. On June 4, McPherson returned a call from Hunt, and Hunt informed McPherson that he was still interested in pursuing an agreement with Nationwide.

On June 4, 1997, the NHL franchise expansion committee met. Bettman informed the committee that Nationwide would build an arena, and McConnell was prepared to go forward with the franchise even if he had to do it himself. The committee was told that Hunt Sports Group's involvement was an open issue, but McConnell as an owner was more than adequate. The expansion committee recommended Columbus to the NHL board of governors as one of four cities to be granted a franchise.

On June 5, 1997, the NHL sent Hunt a letter requesting that he let the NHL know by Monday, June 9, 1997 whether he was going forward with his franchise application. In a June 6, 1997 letter to the NHL, Hunt responded that CHL intended to pursue the franchise application. Hunt informed the NHL that he had arranged a meeting with the members of CHL to be held on June 9, 1997.

Hunt indicated that the application was contingent upon entering into an appropriate lease for a hockey facility.

On June 9, 1997, a meeting took place at Pizzuti's office. Those present at the meeting included McConnell, Hunt, Pizzuti, John F. Wolfe, chairman of Wolfe Enterprises, Inc., and representatives of Buckeye Hockey, L.L.C. and Ameritech. The NHL required that the ownership group be identified and that such ownership group sign a lease term sheet by June 9, 1997. Brian Ellis, president and chief operating officer of Nationwide, presented the lease term sheet to those present at the meeting, left the meeting, and went to a different room.

Hunt indicated the lease was unacceptable. Ameritech and Buckeye Hockey, L.L.C. indicated that if Hunt found it unacceptable, then they too found it unacceptable. Pizzuti and Wolfe agreed to participate along with McConnell. John Christie, president of JMAC, Inc., the personal investment company of the McConnell family, left the meeting and joined Ellis. Christie informed Ellis that McConnell had accepted the term sheet and was signing it in his individual capacity. The term sheet contained a signature line for "Columbus Hockey Limited" as the franchise owner. Ellis phoned his secretary and had her omit the name "Columbus Hockey Limited" on her computer from under the signature line and fax the change to Ellis at Pizzuti's office. McConnell then signed the term sheet as the owner of the franchise. Christie faxed the signed lease term sheet to Bettman that day along with a cover letter and a description of the ownership group. Such ownership group was identified as John H. McConnell, majority owner, Pizzuti Sports, L.L.C., John F. Wolfe, and "[u]p to seven (7) other members." The cover letter indicated that the attached material signified an amendment to the November 1, 1996 application from the city.

On June 17, 1997, the NHL expansion committee recommended to the NHL board of governors that Columbus be awarded a franchise with McConnell's group as owner of the franchise. On the same date, the complaint in the case at bar was filed. On or about June 25, 1997, the NHL board of governors awarded Columbus a franchise with McConnell's group as owner.[2] Hunt Sports Group, Buckeye Hockey, L.L.C. and Ameritech have no ownership interest in the hockey franchise.

On July 3, 1997, after the complaint had been filed, Hunt Sports Group, on behalf of CHL, filed a verified complaint in the Supreme Court of New York, County of New York, against the NHL, Nationwide, McConnell and his son, John

---

2. The ownership group is now formally known as COLHOC Limited Partnership ("COLHOC"). Portions of the record indicate COLHOC was formed before the June 9, 1997 meeting. JMAC, Inc. is the majority owner, and JMAC Hockey, L.L.C. is the general partner of COLHOC. JMAC Hockey, L.L.C. signed the general partnership agreement on June 26, 1997.

P. McConnell, Wolfe Enterprises, Inc., and Pizzuti Sports Limited. Hunt Sports Group set forth various claims for relief arising out of the events set forth above and requested, in part, that the NHL be enjoined from granting a franchise for Columbus to McConnell/COLHOC or from allowing any person other than CHL to obtain or maintain such a franchise. In such complaint, Hunt Sports Group admitted that the franchise had already been awarded to McConnell/COLHOC.

In their complaint, McConnell and Wolfe Enterprises, Inc. requested a declaration that section 3.3 of the CHL operating agreement allowed members of CHL to compete with CHL. Specifically, McConnell and Wolfe Enterprises, Inc. sought a declaration that under the operating agreement, they were permitted to participate in COLHOC and obtain the franchise. On June 23, 1997, McConnell and Wolfe Enterprises, Inc. filed a first amended complaint adding a second claim for relief. The second claim sought judicial dissolution of CHL pursuant to R.C. 1705.47.

On June 23, 1997, Hunt Sports Group filed an answer and counterclaim on its behalf and on behalf on CHL. The counterclaim was asserted against McConnell and alleged breach of contract, breach of fiduciary duty, and interference with prospective business relationships.

On July 3, 1997, McConnell and Wolfe Enterprises, Inc. filed a motion for summary judgment as to count one of the first amended complaint (declaratory judgment as to section 3.3 of the operating agreement) and as to counts one through five of the counterclaim (breach of contract and breach of fiduciary duty). Hunt Sports Group[3] filed a memorandum contra, and McConnell and Wolfe Enterprises, Inc. filed a reply. On October 31, 1997, the trial court rendered a decision, granting summary judgment in favor of McConnell and Wolfe Enterprises, Inc. on count one of the first amended complaint and on counts one and three of the counterclaim. Specifically, the trial court found that section 3.3 of the operating agreement was clear and unambiguous and allowed McConnell and Wolfe Enterprises, Inc. to compete against CHL and obtain the NHL franchise. In addition, the trial court found McConnell did not breach the operating agreement by competing against CHL. The trial court denied the motion for summary judgment as to counts two, four, and five of the counterclaim. Therefore, the claims that remained were count two of the first amended complaint (judicial dissolution of CHL) and counts two, four, five, six, seven, and eight of the counterclaim (breach of fiduciary duty and interference with prospective business relationships).

---

**3.** Hunt Sports Group filed all of its pleadings/motions on behalf of itself and CHL. As Hunt Sports Group's authority to act on behalf of CHL is disputed, we refer to such filings as on behalf of Hunt Sports Group only.

On December 12, 1997, Hunt Sports Group filed a notice of dismissal without prejudice, pursuant to Civ.R. 41(A)(1) and (C), of all the remaining counts in the counterclaim. On December 19, 1997, McConnell and Wolfe Enterprises, Inc. filed a motion for entry of final judgment or, in the alternative, for leave to file a second amended complaint. Hunt Sports Group opposed the motion and filed its own motion for entry of final judgment. On February 17, 1998, the trial court rendered a decision, denying the motions for entry of final judgment and granting McConnell and Wolfe Enterprises, Inc.'s motion for leave to file a second amended complaint.

The second amended complaint added two claims for relief. Count three sought a declaration that McConnell, Wolfe Enterprises, Inc., and other members of COLHOC had not violated any fiduciary duties or committed any other tortious or wrongful acts in connection with the hockey franchise and arena lease. Count four alleged Hunt Sports Group breached the CHL operating agreement, in essence, by unilaterally rejecting the Nationwide lease proposal and by usurping control of CHL.

On March 4, 1998, Hunt Sports Group filed a motion to dismiss the second amended complaint pursuant to Civ.R. 12(B)(6). On April 27, 1998, the trial court denied this motion.

On April 20, 1998, Hunt Sports Group, in its name and on behalf of CHL, filed a complaint for a writ of mandamus and for a writ of prohibition in the Supreme Court of Ohio. Hunt Sports Group named as respondents the Franklin County Court of Common Pleas and the trial judge, Judge John P. Bessey. Hunt Sports Group requested that respondents be enjoined and prohibited from proceeding further in the action below and that a writ of mandamus issue directing respondents to enter final judgment in the action. On April 27, 1998, the Supreme Court of Ohio dismissed the matter. *State ex rel. Hunt Sports Ent. v. Franklin Cty. Court of Common Pleas* (1998), 81 Ohio St.3d 1528, 693 N.E.2d 284.

A jury trial was held in May 1998 on counts three and four of the second amended complaint. McConnell and Wolfe Enterprises, Inc. presented their evidence and then rested. Hunt Sports Group moved for a directed verdict on count four. This motion was denied. Hunt Sports Group presented no evidence. McConnell and Wolfe Enterprises, Inc. then moved for a directed verdict on counts three and four, and Hunt Sports Group moved for a directed verdict on count four. On May 15, 1998, the trial court rendered a decision, denying Hunt Sports Group's motion and granting McConnell and Wolfe Enterprises, Inc.'s motion for directed verdicts on counts three and four of the second amended complaint.

On June 29, 1998, McConnell and Wolfe Enterprises, Inc. filed a motion for attorney fees, pursuant to R.C. 2721.09, on counts one and three of the second amended complaint and as damages for breach of contract. On August 5, 1998, the trial court journalized an order appointing Michael L. Close liquidating trustee of CHL to conclude the affairs of CHL. On September 2, 1998, the trial court rendered a decision, granting McConnell and Wolfe Enterprises, Inc. $920,244 plus interest for attorney fees pursuant to R.C. 2721.09.

On September 18, 1998, the trial court filed a decree of judicial dissolution of CHL. On September 24, 1998, the trial court submitted findings of facts and conclusions of law as to count two of the second amended complaint. The trial court found that wrongful conduct on the part of Hunt Sports Group required that CHL be dissolved. The trial court rendered judgment in favor of McConnell and Wolfe Enterprises, Inc. on count two of the second amended complaint.

On October 15, 1998, the trial court filed a final judgment entry as to all claims. Hunt Sports Group filed a notice of appeal on October 29, 1998. Michael L. Close ("liquidating trustee") filed a notice of appeal on behalf of CHL on November 16, 1998. The appeals have been consolidated. Hunt Sports Group ("appellant") sets forth the following assignments of error:

"1. The trial court erred in granting summary judgment in favor of Plaintiff–Appellees on Count One of their First Amended Complaint and on the First and Third Counts of Defendants' Counterclaim.

"2. The court erred in excluding evidence of breach of fiduciary duties, in misdefining fiduciary duties, and in directing a verdict for Plaintiff–Appellees on Count Three of the Second Amended Complaint. Based upon the evidence presented at trial, and considering that evidence in a light most favorable to Defendants, it cannot be said that reasonable minds could come to but one conclusion, that Plaintiffs had committed no tortious or other wrongful acts. The declaratory judgment granted to Plaintiff–Appellees is not supported by the evidence or in law.

"3. The trial court erred in denying Defendants' Motion for Directed Verdict on Count Four of the Second Amended Complaint and in granting a directed verdict in favor of Plaintiffs on that count.

"4. The trial court abused its discretion in allowing the filing of the Second Amended Complaint after all claims and counterclaims had been resolved.

"5. The trial court erred in denying Defendants' Motion to Dismiss Count Three of the Second Amended Complaint.

"6. The trial court's order dissolving CHL is premised upon findings of fact and conclusions of law which are erroneous and are unsupported by any evidence in the record.

"7. The trial court erred in awarding Plaintiff–Appellees $920,244 in attorney's fees and expenses in this action pursuant to Ohio R.C. § 2721.09."

CHL, through its liquidating trustee, sets forth the following assignments of error:

"A. The Franklin County Court of Common Pleas erred in interpreting paragraph 3.3 of the Columbus Hockey Limited Operating Agreement in such a manner as to allow the members of Columbus Hockey Limited to compete with such limited liability company.

"B. The Franklin County Court of Common Pleas erred in determining that the Plaintiffs did not violate any fiduciary duty owed to any of the Defendants by virtue of their mutual membership interest in Columbus Hockey Limited, in regard to their obtaining the National Hockey League franchise and/or signing an arena lease with Nationwide."

We note that CHL's assignments of error are raised only conditionally, and CHL indicates that if appellant's related assignments of error are sustained, then any judgment as to CHL should also be reversed, and CHL's claims should be reinstated below.

In its first assignment of error, appellant contends the trial court erred in granting summary judgment in favor of McConnell and Wolfe Enterprises, Inc. ("appellees") on count one of the first amended complaint and on counts one and three of appellant's counterclaim. These counts each involve provisions of the operating agreement and will be addressed separately.

Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, 203–204, citing *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. Our review of the appropriateness of summary judgment is *de novo*. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212.

As indicated above, count one of the first amended complaint sought a declaration that section 3.3 of CHL's operating agreement allowed members to compete against CHL to obtain an NHL franchise. Appellees contend section 3.3 is plain and unambiguous and allows what occurred here—COLHOC competing for and obtaining the NHL franchise. Appellant asserts, in part, that the trial court's interpretation of section 3.3 was incorrect and that section 3.3 is ambiguous and subject to different interpretations. Therefore, appellant contends extrinsic evidence should have been considered, and such evidence would have

shown the parties did not intend section 3.3 to mean members could compete against CHL and take away CHL's only purpose.

The construction of written contracts is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. The purpose of contract construction is to discover and effectuate the intent of the parties, and the intent of the parties is presumed to reside in the language they chose to use in the agreement. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949, 951–952. If a contract is clear and unambiguous, there is no issue of fact to be determined, and the court cannot create a new contract by finding an intent not expressed in the clear language employed by the parties. *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984) 15 Ohio St.3d 321, 322, 15 OBR 448, 448–449, 474 N.E.2d 271, 272–273; *Alexander* at 246, 7 O.O.3d at 406, 374 N.E.2d at 150. Only where the language of a contract is unclear or ambiguous or when the circumstances surrounding the agreement invest the language of the contract with a special meaning, will extrinsic evidence be considered in an effort to give effect to the parties' intentions. *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 597 N.E.2d 499, syllabus.

The test for determining whether a term is ambiguous is that common words in a written contract will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall content of the contract. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989) 46 Ohio St.3d 51, 54, 544 N.E.2d 920, 923, citing *Alexander* at paragraph two of the syllabus. A writing will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519, 525–526. For the reasons that follow, we conclude that section 3.3 is plain and unambiguous and allowed members of CHL to compete against CHL for an NHL franchise.

Section 3.3 of the operating agreement states:

"*Members May Compete.* Members shall not in any way be prohibited from or restricted in engaging or owning an interest in any other business venture of any nature, including any venture which might be competitive with the business of the Company."

Appellant emphasizes the word "other" in the above language and states, in essence, that it means any business venture that is different from the business of the company. Appellant points out that under section 2.1 of the operating agreement, the general character of the business is "to invest in and operate a franchise in the National Hockey League." Hence, appellant contends that

members may only engage in or own an interest in a venture that is not in the business of investing in and operating a franchise with the NHL.

Appellant's interpretation of section 3.3 goes beyond the plain language of the agreement and adds words or meanings not stated in the provision. Section 3.3, for example, does not state "[m]embers shall not be prohibited from or restricted in engaging or owning an interest in any other business venture that is different from the business of the company." Rather, section 3.3 states: "any other business venture *of any nature.*" (Emphasis added.) It then adds to this statement: "including any venture which might be competitive with the business of the Company." The words "any nature" could not be broader, and the inclusion of the words "any venture which might be competitive with the business of the Company" makes it clear that members were not prohibited from engaging in a venture that was competitive with CHL's investing in and operating an NHL franchise. Contrary to appellant's contention, the word "other" simply means a business venture other than CHL. The word "other" does·not limit the type of business venture in which members may engage.

Hence, section 3.3 did not prohibit appellees from engaging in activities that may have been competitive with CHL, including appellees' participation in COLHOC. Accordingly, summary judgment in favor of appellees was appropriate, and appellees were entitled to a declaration that section 3.3 of the operating agreement permitted appellees to request and obtain an NHL hockey franchise to the exclusion of CHL.

Appellant next contends that the trial court erred in granting summary judgment in favor of appellees on counts one and three of appellant's counterclaim. Count one of the counterclaim alleged McConnell breached the operating agreement by forming COLHOC for the sole purpose of competing directly with CHL's application for an NHL franchise. Count three avers McConnell breached the operating agreement in refusing to call for additional capital to fund CHL.

■ We have already determined that section 3.3 permitted appellees to request and obtain an NHL franchise. Appellant points to section 4.1(c)(v) of the operating agreement in further support of its argument that McConnell breached the operating agreement in forming COLHOC and in failing to call for additional capital. Section 4.1 states:

*"Approval by Members.* * * *[N]o Member shall take any action *on behalf of the Company* unless such actions are approved by a vote of the specified number of Members:

" * * *

"(c) The following actions require the approval of Members owning all of the Units allocated to the Members:

" * * * *

"(v) do any other act that would make it impossible to carry on the ordinary business of the Company[.]" (Emphasis added.)

As to any argument that McConnell breached section 4.1(c)(v) in forming COLHOC and competing against CHL, there is no genuine issue of material fact, and appellees are entitled to judgment as a matter of law. The voting requirements in section 4.1 apply only to actions taken "on behalf of the Company." In forming COLHOC and in obtaining the NHL franchise, McConnell was obviously not taking action on behalf of CHL. Therefore, McConnell did not breach section 4.1(c)(v) in failing to obtain the vote of all CHL members prior to taking such action.

Appellant averred in count three of its counterclaim that McConnell further breached section 4.1(c)(v) by refusing to call for additional capital to fund CHL. In an affidavit filed in support of appellant's memorandum contra the motion for summary judgment, Hunt stated that at the June 9, 1997 meeting, McConnell informed the other members of CHL that he would attempt to block any effort to raise capital that would allow CHL to obtain an NHL expansion franchise. However, a reading of other sections of the operating agreement shows that McConnell did not breach the operating agreement in allegedly blocking or threatening to block any call for additional capital to fund CHL.

Section 4.1(c)(viii) of the operating agreement requires the approval of all the members of CHL to call for additional capital as provided in section 5.2. Section 5.2 states:

"If at any time or times the Members determine that additional capital is required to preserve and maintain the business of the Company, the Members shall have the opportunity *but not the obligation* to provide such additional capital in proportion to their Percentage Interests." (Emphasis added.)

Further, section 5.1 of the operating agreement states:

"The Members shall have no obligation to make additional capital contributions to the Company."

Hence, McConnell was not obligated to call for or provide additional capital to fund CHL. In addition, and as pointed out by the trial court, the evidence does not show that an actual call for additional capital was even made. A statement by a member that he *would* attempt to block an effort to raise capital *if* such an effort *were* made does not amount to an actual call for additional capital.

Given the above, summary judgment in favor of appellees on counts one and three of appellant's counterclaim was appropriate.

In summary, there are no genuine issues of material fact, appellees are entitled to judgment as a matter of law and reasonable minds could only conclude that section 3.3 of the operating agreement allowed appellees to request and obtain an NHL franchise to the exclusion of CHL, McConnell did not breach the operating agreement by forming COLHOC and competing against CHL, and McConnell did not breach the operating agreement for allegedly refusing to call for or provide additional capital for CHL. Therefore, summary judgment in favor of appellees on count one of the first amended complaint and on counts one and three of appellant's counterclaim was appropriate.

Accordingly, appellant's first assignment of error is overruled.

Appellant's fourth assignment of error will be addressed next. Appellant contends the trial court abused its discretion in allowing the second amended complaint to be filed. Summary judgment disposed of count one of the first amended complaint and counts one and three of the counterclaim. On December 12, 1997, appellant voluntarily dismissed all of its remaining counterclaims. The only claim remaining, therefore, was count two of the first amended complaint—a request for judicial dissolution of CHL. On this same date, appellant apparently faxed the trial court a letter indicating it would not oppose the judicial dissolution of CHL.

Appellees responded with a motion for entry of final judgment or, in the alternative, a motion for leave to file a second amended complaint. Appellees argued that if final judgment was entered, the trial court should include an express declaration that such final judgment was *res judicata* as to all counterclaims and would preclude appellant from attempting to re-file such claims elsewhere. Appellees further stated that given appellant's lack of opposition to dissolution of CHL, final judgment should be entered on count two of the first amended complaint.

In the alternative, appellees requested leave to file a second amended complaint that would add a third claim seeking a declaration that neither appellees nor any other member of COLHOC breached any fiduciary duty or committed any other tortious or wrongful acts in connection with the hockey franchise and arena lease. In addition, the second amended complaint would add a fourth claim for money damages for appellant's alleged breach of contract. On December 31, 1997, appellant filed its own motion for entry of final judgment. On February 17, 1998, the trial court denied the requests for entry of final judgment and granted appellees' motion for leave to file a second amended complaint, stating there was a need for a complete and expeditious resolution of all issues.

Appellant asserts that the trial court lacked jurisdiction to grant appellees leave to amend the complaint once appellant voluntarily dismissed the

remaining counterclaims. However, after appellant's remaining counterclaims were voluntarily dismissed, count two of the first amended complaint remained pending. It is immaterial that the parties may have agreed that dissolution of CHL was appropriate. Hence, the trial court did not lack jurisdiction to grant appellees' motion for leave to amend the complaint.

Appellant further contends appellees' motion for leave to amend the complaint should not have been granted because it was untimely and prejudicial. A motion for leave to amend a pleading pursuant to Civ.R. 15(A) should be granted freely when justice so requires. *Hoover v. Sumlin* (1984), 12 Ohio St.3d 1, 12 OBR 1, 465 N.E.2d 377, paragraph one of the syllabus. The decision whether to grant a motion for leave to amend a pleading is within the discretion of the trial court. *Turner v. Cent. Local School Dist.* (1999), 85 Ohio St.3d 95, 99, 706 N.E.2d 1261, 1264. While Civ.R. 15(A) allows for liberal amendment, such motions should be refused if there is a showing of bad faith, undue delay, or undue prejudice to the opposing party. *Id.*, citing *Hoover* at paragraph two of the syllabus. A motion for leave to amend must be timely filed. See *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 63 O.O.2d 262, 297 N.E.2d 113, paragraph six of the syllabus; *DiPaolo v. DeVictor* (1988), 51 Ohio App.3d 166, 170, 555 N.E.2d 969, 973–974, motion to certify overruled in (1988), 39 Ohio St.3d 720, 534 N.E.2d 350. However, time alone is generally an insufficient reason for the trial court to deny a motion for leave to amend, and the primary consideration is whether there is actual prejudice to the opposing party because of the delay. *Schweizer v. Riverside Methodist Hosp.* (1996), 108 Ohio App.3d 539, 546, 671 N.E.2d 312, 316.

Appellees' motion for leave to file a second amended complaint was filed approximately five weeks before the scheduled trial date. While this could be considered untimely, the trial court did not abuse its discretion in allowing the amendment that added count three because appellant was not prejudiced as a result. Appellees filed their motion for leave to amend only after and in response to appellant voluntarily dismissing its counterclaims. Such motion was filed merely seven days after appellant voluntarily dismissed the remaining counterclaims.

Count three of the second amended complaint sought a declaration that appellees did not breach any fiduciary duty or commit any other wrongful acts in participating in COLHOC. This claim was simply a mirror image of the counterclaims appellant voluntarily dismissed. Therefore, the parties had been litigating the issues involved in such "new" claim ever since the filing of the counterclaims. In addition, while count three purported to include not only the acts of appellees but also the acts of other members of COLHOC (who were not parties to this action), the trial court's subsequent judgment on count three was as to the acts of appellees only.

Given these circumstances, appellant was not prejudiced, and the trial court did not abuse its discretion in allowing the first amended complaint to be amended to add count three. Count four of the second amended complaint, however, added completely new claims against appellant for breach of contract. Other than the claim for judicial dissolution of CHL, appellees' other claims all sought declaratory relief in the form of a declaration that, essentially, appellees did nothing wrong. Appellant had had no claims asserted against it personally until count four. For the reasons that follow, we find the trial court abused its discretion in allowing an amendment to add paragraph 31 of count four. However, because such error was not prejudicial, there is no reversible error.

Count four, paragraph 31 of the second amended complaint, states:

"Hunt violated the CHL Operating Agreement, including Section 4.1 of the Agreement, to the damage and substantial detriment of Plaintiffs, by unilaterally rejecting the Nationwide lease proposal, by failing to negotiate with Nationwide in good faith, by allowing Nationwide's deadline to expire without response, and by failing to advise or obtain the approval of the other members of CHL before unilaterally rejecting Nationwide's offer."

The facts supporting such claims were available to appellees at the time they filed their complaint and first amended complaint. Asserting these new claims against appellant just five weeks prior to trial would have prejudiced appellant. However, the trial court never found against appellant for breach of contract as asserted in paragraph 31.

In addition to paragraph 31, count four included paragraph 32, which averred that appellant violated the operating agreement by wrongfully usurping control of CHL. The trial court directed a verdict against appellant on count four of the second amended complaint for appellant's actions in unilaterally filing on behalf of CHL the answer and counterclaim herein, the action against the trial judge in the Supreme Court of Ohio, and the New York lawsuit. These actions occurred after the filing of the original complaint and, therefore, there was no abuse of discretion in allowing an amendment that added paragraph 32 of count four.

Given all of the above, there was no reversible error, and the trial court did not abuse its discretion in granting appellees' motion for leave to file the second amended complaint. Accordingly, appellant's fourth assignment of error is overruled.

In its fifth assignment of error, appellant contends the trial court erred in denying its motion to dismiss count three of the second amended complaint pursuant to Civ.R. 12(B)(6) for failure to state a claim. As a general matter, a Civ.R. 12(B) motion to dismiss is procedural in nature and tests the sufficiency of

the complaint. *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.* (1992), 65 Ohio St.3d 545, 548, 605 N.E.2d 378, 380–381. Appellant asserts that count three should have been dismissed because it is an improper use of declaratory judgment. Appellant contends count three is untriable in the context of declaratory judgment because it seeks to prove a negative—that appellees are not in breach of any fiduciary duties, and appellees have not committed any other tortious or wrongful acts.

R.C. Chapter 2721, the Declaratory Judgments Act, is remedial in nature; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations and is to be liberally construed and administered. *Swander Ditch Landowners' Assn. v. Joint Bd. of Huron & Seneca Cty. Commrs.* (1990), 51 Ohio St.3d 131, 134, 554 N.E.2d 1324, 1327–1328, quoting *Radaszewski v. Keating* (1943), 141 Ohio St. 489, 496, 26 O.O. 75, 78, 49 N.E.2d 167, 170–171. Declaratory relief may be an alternative to other remedies in those cases in which the court, in its sound discretion, finds that the action is within the spirit of the Declaratory Judgments Act, a real controversy exits between the parties that is justiciable in character, and speedy relief is necessary to the preservation of rights that may be otherwise lost or impaired. *Swander Ditch Landowners' Assn.* at 135, 554 N.E.2d at 1328–1329, citing *Schaefer v. First Natl. Bank of Findlay* (1938), 134 Ohio St. 511, 13 O.O. 129, 18 N.E.2d 263, paragraph three of the syllabus. See, also, *Burger Brewing Co. v. Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 63 O.O.2d 149, 296 N.E.2d 261, paragraph one of the syllabus.

A court can dismiss a declaratory judgment action under Civ.R. 12(B)(6) for only two reasons: (1) where there is no real controversy or justiciable issue between the parties, or (2) when the declaratory judgment will not terminate the uncertainty or controversy. *AEI Group, Inc. v. Ohio Dept. of Commerce* (1990), 67 Ohio App.3d 546, 550, 587 N.E.2d 889, citing *Fioresi v. State Farm Mut. Auto. Ins. Co.* (1985), 26 Ohio App.3d 203, 203–204, 26 OBR 424, 424–425, 499 N.E.2d 5, 5–6. For the reasons that follow, we find the trial court did not err or abuse its discretion in denying appellant's motion to dismiss count three of the second amended complaint.

As indicated above, count three of appellees' second amended complaint was simply a reiteration of the issues set forth in appellant's dismissed counterclaims for breach of fiduciary duty and for tortious interference with prospective business relationships. The only difference is that appellees set forth the issues in the context of requesting a declaration that they did not commit such acts. The issues and acts involved in count three were known to and had been litigated by the parties since the filing of appellant's counterclaim. Appellant had indicated that it would file suit on these same issues in the New York case if they

were not tried in the case at bar. Hence, there existed a real controversy between the parties that was capable of resolution by the trial court, and such resolution would have an immediate impact on the parties. In short, the controversies set forth in count three were ripe for review.

In addition, the issues in count three are within the spirit of the Declaratory Judgments Act. R.C. 2721.03 states that any person interested under a written contract may have determined any question of construction or validity arising under such contract and obtain a declaration of rights, status, or other legal relations thereunder. At the center of this case has been the meaning of section 3.3 of the operating agreement. Count·one of the first amended complaint sought, in essence, a declaration as to the meaning of section 3.3. This claim involved the trial court's declaring the parties' rights and status under section 3.3 and, as such, was the type of claim normally brought under the Declaratory Judgments Act. While count three of the second amended complaint is not in substantive form a contract interpretation claim but rather sounds in tort, the resolution of the issues involved in count three turn, in essence, on what acts were permitted under section 3.3 of the operating agreement. Hence, the issues in counts one and three are interrelated.

Further, it is no matter that the declaration sought by appellees would be in the form of a negative declaration (*i.e.*, a declaration that appellees did not breach any fiduciary duties or tortiously interfere with prospective business relationships). Indeed, the United States Supreme Court has stated that the similar federal Declaratory Judgment Act, Sections 2201, 2202, Title 28, U.S.Code, allows prospective *defendants* to sue to establish their *nonliability. Beacon Theatres, Inc. v. Westover* (1959), 359 U.S. 500, 504, 79 S.Ct. 948, 953, 3 L.Ed.2d 988, 993–994. The Supreme Court of Ohio has stated that an insurer may maintain an action for declaratory judgment as to its *nonliability* under an insurance policy. See *Ohio Farmers Indemn. Co. v. Chames* (1959), 170 Ohio St. 209, 163 N.E.2d 367, syllabus. The Supreme Court of Ohio went on to state that the Declaratory Judgments Act goes further than merely applying to contract construction cases and may properly be invoked to obtain a declaration of rights, status, or other legal relations that requires factual determinations. *Id.* at 213, 163 N.E.2d at 370–371.

Lastly, the trial court did not abuse its discretion in determining that an expeditious disposition of the controversies involved was necessary. As stated above, the related claim in count one had already been disposed of by way of summary judgment. Appellant voluntarily dismissed its remaining counterclaims and made it clear it would file related claims in the New York action. It was within the trial court's discretion to determine that such issues should be tried in

the same action, as such would end the obvious controversy between the parties in a timely fashion.

Given all of the above, the trial court did not abuse its discretion in denying appellant's motion to dismiss count three of the second amended complaint on the basis it was an improper claim under the Declaratory Judgments Act. Accordingly, the fifth assignment of error is overruled.

In its second assignment of error, appellant raises various issues regarding the events leading up to the trial on count three of the second amended complaint and the eventual granting of a directed verdict in favor of appellees on this claim. As indicated above, count three sought a declaration that appellees did not breach any fiduciary duties and did not tortiously interfere with prospective business relationships. As a general matter, appellant contends the trial court erred in excluding evidence that would have shown appellees breached fiduciary duties. For the reasons that follow, we find the trial court did not err in excluding certain evidence.

On May 5, 1998, the trial court granted appellees' motion for preliminary jury instructions and stated it would instruct the jury that appellees did not violate any fiduciary duty by forming or participating in COLHOC, and appellees did not violate any fiduciary duty in allegedly preparing to compete against appellant and CHL. At the beginning of the trial, the trial court instructed the jury that appellees did not violate any duty by forming and joining COLHOC, by allegedly excluding appellant from participating in an NHL franchise, by preparing to compete against CHL and in not providing additional capital for CHL.

Such instruction was proper because, as discussed in the first assignment of error, appellees were permitted to compete against CHL for a hockey franchise, and there was no requirement that CHL members contribute additional capital. As will be addressed in more detail *infra*, these acts in and of themselves would not constitute breach of fiduciary duty because the operating agreement allowed such acts.

Appellant next contends it was erroneously precluded from eliciting certain testimony from the president of JMAC, Inc., Christie, regarding McConnell's failure to seek approval from CHL members prior to taking certain competitive actions against CHL. At trial, Christie was asked on cross-examination whether there was ever a vote of CHL members to authorize McConnell to substitute his name for CHL's as the potential franchise holder. An objection to such question was sustained. Whether such was error is immaterial because appellant had already successfully elicited this exact testimony. Christie had previously testified that McConnell did not get CHL approval for agreeing with

the NHL to become the franchise applicant and to put his name in place of CHL's·as the franchise applicant.

■ Christie was asked whether there was any vote by CHL to approve changing the signature line on the Nationwide lease term sheet on June 9, 1997. An objection to this question was sustained. In sustaining such objection, the trial court stated that it had previously ruled a member of CHL could compete against CHL, and there was no need for CHL to approve McConnell's actions. Further, the trial court stated it was ruling, as a matter of law, that failure to seek permission of members of CHL to compete with CHL was not a violation of any fiduciary duty. Lastly, Christie was asked whether he recognized, despite the judge's ruling that competition was not a breach of contract, that competing with CHL could be a violation of fiduciary obligations. The trial court sustained the objection to such question, stating that competing for a franchise was not a breach of fiduciary duty and that it was "the method of competing for the franchise which might be a breach of a fiduciary duty. If in the parlance of the street Mr. McConnell engaged in dirty pool to compete for this contract, then that type of competition could be a breach of fiduciary duty." These rulings were not erroneous.

■ As already noted, appellant had already elicited testimony that McConnell did not ask for or obtain CHL approval prior to competing with CHL for the franchise. Further, the trial court was correct in stating that it could not be considered a breach of fiduciary duty, in and of itself, to compete against CHL because the operating agreement allowed such competition. Contract provisions may affect the scope of fiduciary duties, and as such, the trial court was correct to indicate that the method of competing, not the competing itself, may constitute a breach of fiduciary duty.

Appellant next raised issues related to a motion *in limine* that sought to exclude any reference to discussions held and/or agreements made prior to appellant executing the operating agreement. In granting such motion, the trial court stated that appellant did not establish its legal association with CHL until June 6, 1997 when it signed the CHL operating agreement and, therefore, appellant owed CHL no obligations, and appellant had no rights with CHL prior to this date.

■ As a preliminary matter, we note that the trial court erred in concluding appellant was not a member of CHL prior to executing the operating agreement. R.C. 1705.01(G) states that a member of a limited liability company is a person whose name appears on the records of the company as the owner of a membership interest in that company. Further, a person becomes a member of a limited liability company at the time the company is formed or at any later time that is

specified in the records of the company for becoming a member. R.C. 1705.14(A).

Section 1.2 of the CHL operating agreement states that the agreement becomes effective on the date that an executed copy of the articles of organization are filed with the Secretary of State. CHL's articles of organization were filed with the Secretary of State on October 31, 1996.

Section 11.1(l), article XI, of the operating agreement states that "Members" is defined in section 3.1. Section 3.1 states:

*"Members. The members of the Company ('Members') shall be those persons or entities identified as such on Schedule A, as such Schedule shall be amended from time to time.* The names and addresses of the Members, the amount of their contribution to the capital of the Company, the number of Units credited to each Member and their Percentage Interests are set forth in Schedule A." (Emphasis added.)

Appellant is identified on Schedule A and is credited with a capital contribution of $25,000 and as having twenty-five units. Appellant made such capital contribution on November 12, 1996. Therefore, pursuant to the Revised Code and the operating agreement, appellant was a member of CHL from its inception even though appellant did not execute a copy of the operating agreement until June 6, 1997. Hence, in this regard, the trial court erred in concluding otherwise. However, this conclusion was harmless error.

■■■■■ The motion *in limine* at issue precluded the introduction of evidence of discussions had and agreements made prior to appellant's execution of the operating agreement. A motion *in limine*, if granted, is a tentative, interlocutory and precautionary ruling that reflects the trial court's anticipatory treatment of an evidentiary issue. *State v. Grubb* (1986), 28 Ohio St.3d 199, 201–202, 28 OBR 285, 287–289, 503 N.E.2d 142, 145–146. At trial, it is incumbent upon a defendant who has been temporarily restricted from introducing evidence by virtue of a motion *in limine* to seek the introduction of the evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal. *Id.* at paragraph two of the syllabus; see, also, *Garrett v. Sandusky* (1994), 68 Ohio St.3d 139, 141, 624 N.E.2d 704, 706–707. The issuance of a motion *in limine* itself does not preserve the error for appeal except where the exclusion of the evidence affects a substantial right, and the substance of the excluded evidence is apparent from the context of questioning by counsel who later seeks to predicate as error the exclusion of the evidence. *Grubb* at 202, 28 OBR at 288–289, 503 N.E.2d at 145–146. Appellees contend appellant failed to properly preserve any error.

An examination of the trial transcript indicates that appellant did not preserve any error for appeal. Appellees contend appellant improperly proffered fiduciary duty evidence after it rested and outside the presence of the court. We disagree with this contention. The record shows that prior to resting, appellant informed the trial court that it would have proffers. The trial judge told appellant that he would excuse himself, and appellant could then proffer. Appellant rested and then made its proffers for the record. Given the trial court's instructions on how appellant should proceed with its proffers, appellees' contentions in this regard are not well taken. However, while appellant's proffer was not improper, it still failed to properly preserve any error for appeal.

As discussed above, the trial court's granting of the motion *in limine* was merely a preliminary ruling. Appellant was obligated to seek the introduction of testimony at trial. Appellant did not do so. Instead, appellant merely made an offer of proof at the end of trial. Having not actually made an attempt to elicit testimony that was the subject of the motion *in limine*, and the substance of such evidence not being apparent from the context of actual questioning by counsel, no error has been preserved for appeal.

In summary, the trial court did not err and appellant failed to preserve any error in regard to the evidentiary issues discussed above. We now address the substance of the trial court's granting of appellees' motion for a directed verdict on count three of the second amended complaint. The trial court found, in essence, that the evidence did not show appellees interfered with appellant's prospective business relationships with Nationwide or the NHL. As to the fiduciary duty issue, the trial court found, in part, that appellees had not engaged in any kind of willful misconduct, misrepresentation, or concealment. Therefore, the trial court concluded that appellees had not breached any fiduciary duty in seeking and obtaining the NHL franchise and in negotiating with Nationwide concerning the arena lease. For the reasons that follow, we conclude that a directed verdict on count three of the second amended complaint was appropriate.

A motion for a directed verdict may be granted when the trial court, construing the evidence most strongly in favor of the nonmoving party, finds that upon any determinative issue, reasonable minds can come to but one conclusion upon the evidence submitted and that conclusion is adverse to the nonmoving party. *Malone v. Courtyard by Marriott L.P.* (1996), 74 Ohio St.3d 440, 445, 659 N.E.2d 1242, 1246–1247. In determining whether to direct a verdict, the trial court does not engage in a weighing of the evidence nor does it evaluate the credibility of witnesses. *Id.* Rather, the trial court is confronted solely with a question of law: was there sufficient material evidence at trial so as to create a factual question for the jury. *Id.* Our review of the trial court's ruling on a

motion for a directed verdict is *de novo*. *Titanium Industries v. S.E.A., Inc.* (1997), 118 Ohio App.3d 39, 47–48, 691 N.E.2d 1087, 1092–1093.

Before we can review the propriety of the directed verdict in this case, the law on fiduciary duty and interference with a prospective business relationship must be addressed. The term "fiduciary relationship" has been defined as a relationship in which special confidence and trust is reposed in the integrity and fidelity of another, and there is a resulting position of superiority or influence acquired by virtue of this special trust. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 442, 662 N.E.2d 1074, 1081. In the case at bar, a limited liability company is involved which, like a partnership, involves a fiduciary relationship. Normally, the presence of such a relationship would preclude direct competition between members of the company. However, here we have an operating agreement that by its very terms allows members to compete with the business of the company. Hence, the question we are presented with is whether an operating agreement of a limited liability company may, in essence, limit or define the scope of the fiduciary duties imposed upon its members. We answer this question in the affirmative.

A fiduciary has been defined as a person having a duty, *created by his or her undertaking*, to act primarily for the benefit of another in matters *connected with such undertaking*. *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 216, 527 N.E.2d 1235, 1243. A claim of breach of fiduciary duty is basically a claim for negligence that involves a higher standard of care. *Id.* In order to recover, one must show the existence of a duty on the part of the alleged wrongdoer not to subject such person to the injury complained of, a failure to observe such duty, and an injury proximately resulting therefrom. *Id.* These principles support our conclusion that a contract may define the scope of fiduciary duties between parties to the contract.

Here, the injury complained of by appellant was, essentially, appellees' competing with CHL and obtaining the NHL franchise. The operating agreement constitutes the undertaking of the parties herein. In becoming members of CHL, appellant and appellees agreed to abide by the terms of the operating agreement, and such agreement specifically allowed competition with the company by its members. As such, the duties created pursuant to such undertaking did not include a duty not to compete. Therefore, there was no duty on the part of appellees to refrain from subjecting appellant to the injury complained of herein.

We find further support for our conclusion in case law concerning close corporations and partnerships. In *Cruz v. S. Dayton Urological Assoc., Inc.* (1997), 121 Ohio App.3d 655, 700 N.E.2d 675, the plaintiff filed suit against his former shareholders in a close corporation, alleging, in part, breach of fiduciary

duty. The plaintiff had been a shareholder in a professional corporation organized for the practice of medicine. *Id.* at 658, 700 N.E.2d at 677. The plaintiff was employed by the corporation pursuant to a written agreement. *Id.* Such agreement provided that the corporation or employee could terminate the employment contract unilaterally and without specification of cause upon ninety days' written notice. *Id.* The plaintiff was terminated after the other shareholders voted to terminate him. *Id.*

The court of appeals recognized that shareholders have a fiduciary duty to each other and that such duty is heightened in a close corporation setting. *Id.* at 662, 700 N.E.2d at 679–680. The court cited *Gigax v. Repka* (1992), 83 Ohio App.3d 615, 623, 615 N.E.2d 644, 649–650, wherein such court concluded that a minority shareholder/employee in a close corporation was not an at-will employee who was terminable at any time by the majority shareholders. Rather, the *Gigax* court concluded that the fiduciary duty that partners owe each other requires that removal of a partner be based upon legitimate business reasons. *Cruz* at 662, 700 N.E.2d at 679–680, quoting *Gigax* at 623, 615 N.E.2d at 649–650.

The *Cruz* plaintiff claimed the other shareholders breached their fiduciary duty by terminating him without a legitimate business reason. *Id.* at 663, 700 N.E.2d at 680. However, the *Cruz* court distinguished *Gigax*, noting that in *Gigax* the shareholder/employee had not entered into an employment agreement with the corporation that permitted termination without cause. *Id.* at 662, 700 N.E.2d at 679–680. The court of appeals stated that when the plaintiff agreed that the corporation could terminate him without specification of cause, he relieved the corporation and shareholders of any duty they owed him to terminate him only for good cause. *Id.*

The *Cruz* case stands for the proposition that close corporation employment agreements may limit the scope of fiduciary duties that otherwise would apply absent certain provisions in such agreements. The same principle has been applied in situations involving partnerships that are subject to partnership agreements. See *Spayd v. Turner, Granzow & Hollenkamp* (1985), 19 Ohio St.3d 55, 59, 19 OBR 54, 57–58, 482 N.E.2d 1232, 1236 (the respective rights of partnership members depend primarily on the specific provisions contained within the partnership contract as recognized in R.C. 1775.17, which states that the rights and duties of partners are subject to any agreement between the partners).

"Operating agreement" is defined in R.C. 1705.01(J) as all of the valid written or oral agreements of the members as to the affairs of a limited liability company and the conduct of its business. R.C. 1705.03(C) sets forth various activities limited liability companies may engage in and indicates such are subject to the company's articles of organization or operating agreement. Indeed, many of the

statutory provisions in R.C. Chapter 1705 governing limited liability companies indicate they are, in various ways, subject to and/or dependent upon related provisions in an operating agreement. See, for example, R.C. 1705.11, 1705.12, 1705.13, 1705.15, 1705.16, 1705.18, 1705.22, 1705.24, 1705.25, 1705.26, 1705.29, 1705.31, 1705.40, 1705.43, 1705.44, and 1705.46. Here, the operating agreement states in its opening paragraph that it evidences the mutual agreement of the members in consideration of their contributions and promises to each other. Such agreement specifically allowed its members to compete with the company.

Given the above, we conclude as a matter of law that it was not a breach of fiduciary duty for appellees to form, COLHOC and obtain an NHL franchise to the exclusion of CHL. In so concluding, we are not stating that *no* act related to such obtainment could be considered a breach of fiduciary duty. In general terms, members of limited liability companies owe one another the duty of utmost trust and loyalty. However, such general duty in this case must be considered in the context of members' ability, pursuant to operating agreement, to compete with the company.

We now turn to the elements of tortious interference with a prospective business relationship. The tort of interference with a business relationship occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another. *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 14, 651 N.E.2d 1283, 1294. The elements of tortious interference with a business relationship are (1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom. *Chandler & Assoc., Inc. v. Am. Healthcare Alliance, Inc.* (1997), 125 Ohio App.3d 572, 583, 709 N.E.2d 190, 197–198.

With the above principles as our guide, we conclude that a directed verdict in favor of appellees on count three of the second amended complaint was appropriate. The essential facts, construed most strongly in favor of appellant, have been set forth above. This evidence shows that appellees obtained the NHL franchise to the exclusion of CHL. This constituted direct competition with CHL. However, appellees were permitted under the operating agreement to compete with CHL and, as discussed above, this in and of itself cannot constitute a breach of fiduciary duty. Further, in so competing, appellees did not engage in any acts that would otherwise constitute wrongful behavior. Nationwide contacted McConnell only after appellant indicated the lease terms were unacceptable. Even then, McConnell stated he would accept the lease terms and obtain the franchise on his own only if appellant did not. There is no evidence that

McConnell acted in any secretive manner in his actions leading up to the franchise award or that he used CHL assets for personal gain. In short, the evidence shows that appellees obtained the NHL franchise to the exclusion of CHL. Appellees did nothing beyond this that could constitute a breach of fiduciary duty.

Likewise, the evidence does not show that appellees tortiously interfered with appellant's prospective business relationships with Nationwide and the NHL. The evidence does not show that appellees induced or otherwise purposely caused Nationwide and the NHL not to enter into or continue a business relationship with appellant. Indeed, and as indicated above, the evidence shows that McConnell stated he would lease the arena and obtain the franchise only if appellant did not. It was only after appellant rejected the lease proposal on several occasions that McConnell stepped in. Appellant had yet another opportunity on June 9, 1997 to participate in the Nationwide arena lease and the NHL franchise. Appellant again found the lease proposal unacceptable, and without a signed lease term sheet, there would have been no franchise from the NHL.

McPherson testified that Nationwide would accept a lease agreement with whomever the successful franchise applicant was. In addition, it is clear from Bettman's testimony that the NHL was still considering appellant as a potential franchise owner up until the last moment. Again, the evidence does not show that appellees' actions constituted an intentional interference with appellant's business relationships. It must be noted that appellees had the right to compete against CHL. However, even given such right, McConnell did not approach Nationwide or the NHL. Nationwide approached McConnell only after appellant indicated the lease terms were unacceptable. In short, it was appellant's actions that caused the termination of any relationship or potential relationship it had with Nationwide and the NHL.

In conclusion, there was not sufficient material evidence presented at trial so as to create a factual question for the jury on the issues of breach of fiduciary duty and tortious interference with business relationships. Therefore, a directed verdict in favor of appellees on count three of the second amended complaint was appropriate.

Given our disposition of all issues raised under this assignment of error, appellant's second assignment of error is overruled.

In its third assignment of error, appellant contends the trial court erred in denying its motion for a directed verdict and in granting appellees' motion for a directed verdict on count four of the second amended complaint. Count four of the second amended complaint sought money damages for appellant's alleged breach of contract in unilaterally rejecting the Nationwide lease proposal, in

failing to negotiate with Nationwide in good faith, in allowing Nationwide's deadline to expire without response, and in wrongfully and unlawfully usurping control of CHL. In granting appellees' motion for a directed verdict, the trial court found appellant violated the CHL operating agreement in failing to ask for and obtain the authorization of CHL members, other than appellees, prior to filing the answer and counterclaim in this action and the suit in New York and by instigating the action against the trial judge in the Supreme Court of Ohio. The trial court awarded appellees $1.00 in damages.

▮▮▮ The principles of law set forth in the second assignment of error as to directed verdicts apply to this assignment of error. Appellant contends that under the operating agreement, it could only be liable for willful misconduct. In addition, appellant contends it was the "operating member" of CHL and, therefore, had full authority to act on CHL's behalf. For the reasons that follow, we conclude that a directed verdict in favor of appellees on count four of the second amended complaint was appropriate.

First, there was no evidence at trial that appellant was the operating member of CHL. The operating agreement, which sets forth the entire agreement between the members of CHL, does not name any person or entity the operating or managing member of CHL. Instead, all members of CHL had an equal number of units in CHL, as reflected by the amount of their capital contributions shown on Schedule A of the operating agreement. Pursuant to section 4.1 of the operating agreement, no member was permitted to take any action on behalf of the company unless such action was approved by the specified number of members, which was, at the very least, a majority of the units allocated.

This brings us to the question of whether appellant breached the operating agreement by failing to obtain the approval of the other CHL members prior to filing, in CHL's name, the answer and counterclaim in this suit, the suit in New York, and the suit against the trial judge in the Supreme Court of Ohio. Again, section 4.1(b) of the operating agreement requires at least majority approval prior to taking any action on behalf of CHL. Further, the approval of the members as to any action on behalf of CHL must have been evidenced by minutes of a meeting properly noticed and held or by an action in writing signed by the requisite number of members. See section 4.2 of the operating agreement.

There is no evidence that appellant obtained the approval of CHL members prior to filing the actions listed above. Indeed, there is no evidence that appellant even asked permission of any member to file the actions, let alone held a meeting or requested approval in writing. The evidence does show that appellant, in the name of CHL, filed the answer and counterclaim in the present suit, the action in New York, and the action against the trial judge in the

Supreme Court of Ohio. This was contrary to sections 4.1 and 4.2 of the operating agreement and constituted breach of such agreement.

■■■ Appellant points to section 4.4 of the operating agreement and contends appellees had to show willful misconduct on its part in filing such actions. Section 4.4 states:

"*Exculpation of Members; Indemnity. In carrying out their duties hereunder,* the Members shall not be liable to the Company or to any other Member for their good faith actions, or failure to act, or for any errors of judgment, or for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement, but only for their own willful misconduct in the performance of their obligations under this Agreement. Actions or omissions taken in reliance upon the advice of legal counsel as being within the scope of authority conferred by this Agreement shall be conclusive evidence of such good faith; however, good faith may be determined without obtaining such advice." (Emphasis added.)

Section 4.4's provisions are in the context of members carrying out their duties under the operating agreement. There was no duty on appellant's part to unilaterally file the actions at issue. Indeed, we have determined that appellant did not act properly under the operating agreement in filing such actions. Hence, the provision in section 4.4 indicating members were only liable to other members for their own willful misconduct in the performance of their obligations under the operating agreement does not even apply to the actions taken by appellant. However, even if we applied this provision, the evidence shows appellant engaged in willful misconduct in filing the actions at issue.

As indicated above, appellant was a member of CHL at the time of its formation. As a member of CHL, appellant agreed to be bound by the terms of the operating agreement. Hunt read the operating agreement prior to signing it. The agreement required a majority vote prior to taking any action on behalf of CHL, such as the filing of the actions at issue. Appellant nonetheless filed such actions without obtaining the required approval and, indeed, without even asking one member (other than itself) for such permission.

Appellant contends it filed such actions upon the advice of counsel and, therefore, good faith existed. However, there is no evidence that appellant took such actions in reliance upon advice from counsel that such actions were within the scope of authority conferred by the operating agreement. Thomas Fowler, general counsel for Unity Hunt, Inc., testified that as appellant's chief legal officer, he was responsible for the New York suit, appellant caused the filing by CHL of the suits in New York and in the Supreme Court of Ohio, and he had overall responsibility for representing appellant in all the actions at issue.

Fowler testified that Hunt approved the action against the trial judge. This evidence does not establish that appellant relied upon advice of counsel that filing such actions were within the scope of authority conferred by the operating agreement. It is simply evidence that appellant filed such actions and that appellant's general counsel had responsibility over such litigation.

Given all of the above, we conclude that a directed verdict in favor of appellees on count four of the second amended complaint was appropriate. Therefore, appellant's third assignment of error is overruled.

In its sixth assignment of error, appellant contends the trial court's order dissolving CHL was premised upon erroneous findings of fact and conclusions of law. In essence, appellant asserts that the trial court erred in finding appellant wrongfully caused the dissolution of CHL. We note that as a purely procedural matter, the dissolution of CHL was caused by a decree of judicial dissolution that was journalized on September 18, 1998. Approximately one month earlier, on August 15, 1998, the trial court journalized an order appointing a liquidating trustee to wind up the affairs of CHL. On September 28, 1998, appellees filed, pursuant to Civ.R. 52, proposed findings of fact and conclusions of law for the adjudication of count two of the second amended complaint. Count two had requested judicial dissolution of CHL pursuant to R.C. 1705.47.

On October 2, 1998, the trial court filed its corrected findings of fact and conclusions of law for the adjudication of count two. The trial court found that appellant unlawfully usurped control of CHL by unilaterally rejecting the Nation-wide lease proposal, by failing to disclose the proposal to CHL, and by commencing litigation in the trial court, in the Supreme Court of New York, and in the Supreme Court of Ohio. The trial court found that such actions made it no longer feasible, profitable, advantageous, and reasonably practicable to operate the business of CHL. Based on these findings of fact, the trial court concluded that as a result of appellant's wrongful conduct, CHL should be judicially dissolved. Further, the trial court cited section 9.2(a) of the operating agreement that stated that members who have not wrongfully caused the dissolution of CHL or the liquidating trustee shall proceed with CHL's liquidation. Therefore, the trial court concluded that all members of CHL except for appellant shall be responsible for and have the legal authority and power to undertake the winding up, or liquidation, of CHL. Lastly, the trial court granted judgment in favor of appellees on count two of the second amended complaint and ordered appellant to bear all costs.

R.C. 1705.47 states that upon application by a member of a limited liability company, a court of common pleas may decree the dissolution of that company if it is not reasonably practicable to carry on the business of the company in conformity with its articles of organization and operating agreement.

We note that appellant does not challenge the dissolution of CHL. Appellant merely challenges the trial court's findings of fact and conclusions of law that base the dissolution upon appellant's wrongful conduct. As a matter of law, neither R.C. 1705.47 nor any other provision of the Revised Code requires a determination of wrongful conduct prior to making a finding that it is not reasonably practicable to carry on the business of the company and, therefore, decreeing the dissolution of such company. Rather, all that is required is a determination that it is not reasonably practicable to carry on the business in conformity with the articles of incorporation and operating agreement.

Here, the trial court found it was no longer practicable to operate CHL, but it premised such a determination on appellant's wrongful conduct. In addition, the trial court found appellant could not participate in the winding up of CHL because appellant wrongfully caused the dissolution of CHL. The trial court cited section 9.2(a) of the operating agreement that states:

"Upon the dissolution of the Company, those Members who have not wrongfully caused the dissolution of the Company ('Liquidating Members'), or the Liquidating Trustee appointed pursuant to section 9.3, shall proceed with the liquidation of the Company."[4]

Hence, it is only as to who may participate in the liquidation of CHL that a determination of wrongful conduct is necessary. For the reasons that follow, we determine that the trial court erred in finding appellant wrongfully caused the dissolution of CHL. However, the evidence does support the trial court's conclusion that it was no longer practicable to carry on the business of CHL.

We note first that while it is not necessary under R.C. 1705.47 to determine that wrongful conduct caused the dissolution of a company, it is possible that wrongful conduct is the underlying reason for it no longer being practicable to carry on the business of a company. This is essentially what the trial court found below—that appellant's wrongful conduct made it no longer practicable to carry on the business of CHL. Related to this was the trial court's determination that appellant could not participate in the winding up of CHL's affairs since it wrongfully caused the dissolution. The trial court's determinations in this regard were erroneous because, while appellant did act wrongfully and breached the operating agreement in usurping control of CHL, such was not the reason it became no longer practicable to carry on the business of CHL.

---

4. R.C. 1705.44 states that except as otherwise provided in the operating agreement, the members of a dissolved limited liability company who have not wrongfully dissolved the company may wind up the affairs of the company.

As stated many times in this opinion, appellees were permitted to compete against CHL in obtaining a hockey franchise for Columbus. The evidence shows that appellees—more specifically, McConnell—did not really begin such competition until after appellant unilaterally rejected the Nationwide lease proposal. However, to go from appellant's unilateral rejection of the lease proposal to such being the cause of the dissolution of CHL would be to ignore the evidence and to, instead, assume that absent appellant's wrongful conduct, CHL would have signed the lease proposal and been granted the hockey franchise. The evidence simply does not support such a finding.

The evidence shows that appellant unilaterally and wrongfully rejected the Nationwide lease proposal on behalf of CHL on May 28 and 29, 1997. Further, appellant did not respond to Nationwide's deadline of Friday, May 30, 1997 for accepting the proposal. It was at this time that McConnell was made aware of the lease proposal and of appellant's apparent rejection thereof. Prior to this, on Wednesday, May 28, 1997, Wolfe was made aware of the lease proposal because McPherson phoned him and proposed that Wolfe Enterprises, Inc. be Nationwide's partner in the arena. Hence, as of Friday, May 30, 1997, three of CHL's members were aware of Nationwide's proposal and at least two members (appellant and McConnell) were aware of appellant's rejection of such proposal.

We note that there is no dispute that in rejecting the Nationwide proposal, appellant was, albeit wrongfully, acting on behalf of CHL. On the other hand, there is no evidence that appellees, in taking any of the actions occurring after May 28, 1997, were proceeding as members of CHL. Indeed, McConnell testified on May 8, 1998 during trial that, to his knowledge, he was not a member of CHL, that he was unaware CHL still existed and that he "thought [CHL] died when the election went down." Of course, CHL was still in existence, McConnell was still a member, and CHL was not dissolved until September 18, 1998. Even knowing this, we cannot speculate as to what would have occurred had appellant brought the lease proposal to the full membership of CHL, including McConnell, prior to rejecting it on May 28 and 29, 1997. The evidence does show, however, that on June 4, 1997, Hunt faxed McConnell a letter stating, in part, that there would be a "hockey members' meeting" on Monday (June 9) and that neither the Hunts nor CHL had withdrawn their interest in the NHL team. On June 6, 1997, a letter from appellant to the NHL indicated that CHL intended to pursue the expansion application and that all CHL members were attending a "formal" meeting on June 9, 1997. Hence, in appellant's mind, CHL was still alive and still vying for the franchise.

On June 9, 1997, all the members of CHL attended a meeting called by appellant. By this time, the NHL expansion committee had recommended that Columbus be awarded a franchise and that the ownership group would include, at

the very least, McConnell, with appellant's participation still up in the air. A Nationwide representative delivered the lease term sheet to the meeting. The term sheet contained the name Columbus Hockey Limited as the franchise owner. An attached cover letter also addressed to CHL indicated that Nationwide was prepared to proceed on its arena plan with the successful applicant under the lease terms and conditions attached to the letter. The evidence shows that without a signed lease term sheet by an ownership group, Columbus would not have been awarded a franchise.

One of the McConnells (either McConnell or his son, John P. McConnell) asked those present at the meeting whether they were willing to be investors based upon the lease terms as presented that day. Appellant responded that the lease terms were unacceptable, Ameritech and representatives of Buckeye Hockey, L.L.C. stated that if Hunt found the terms unacceptable then they too found them unacceptable, and Pizzuti and Wolfe agreed to participate. The signature line on the lease term sheet was changed to omit CHL as the franchise owner, McConnell signed the lease term sheet, and this and accompanying documents were faxed to the NHL. Soon thereafter, the franchise was awarded to Columbus with McConnell's group, now known as COLHOC, as the owner of the franchise.

The above evidence indicates that on June 9, 1997, individuals that were members of CHL met and decided whether they would participate in a lease with Nationwide and, thus, be part of the ownership group. Three of these individuals decided the lease terms were unacceptable. Three individuals decided they would participate in the lease agreement. Each of the members of CHL, whether they were acting as members of CHL, as individuals, or as members of a different entity vying for the franchise, were permitted to so "vote." It was the decisions made at that meeting that ultimately determined who the ownership group was. Because such ownership group did not turn out to be CHL, there was no reason for CHL's existence anymore.

The fact that the franchise was owned by a group different from the ownership group originally contemplated made it no longer reasonably practicable to carry on the business of CHL, as CHL's only business was investing in and operating an NHL franchise. Appellant's wrongful actions taken in the weeks previous to the June 9, 1997 meeting had no effect on the ultimate outcome. Again, McConnell did not even think CHL was in existence anymore. There is no evidence as to what Buckeye Hockey, L.L.C. and Ameritech believed in regard to CHL. The evidence only shows that they attended a June 9, 1997 meeting called by appellant as a CHL meeting. The original lease term sheet, which had to be signed that day in order for Columbus to still be considered for a franchise, was made out to CHL. Hence, despite appellant's earlier wrongful conduct in

unilaterally rejecting the lease proposal and in failing to respond to Nationwide's May 30 deadline, the evidence shows that Nationwide was still willing to enter into an agreement with CHL. Indeed, the lease term sheet was made out to CHL as the franchise owner.

The evidence does indicate that at the June 9 meeting, which was called by appellant, McConnell was acting solely as an individual and not as a member of CHL. McConnell testified that when Hunt called him and asked that he be at the June 9 meeting, McConnell responded that he would be there and would welcome Hunt's participation in the ownership team. At the June 9 meeting, McConnell offered Hunt the opportunity to invest up to the same level as the McConnells, but the McConnells would be the managing partner. McConnell further testified that on June 9, he believed that his group was the only group with a franchise application pending. McConnell testified that his group submitted an application on June 4, 1997 and at that time, he believed "CHL was dead as far as [he] was concerned."

Indeed, Christie testified that what McConnell proposed to the individuals at the June 9 meeting was a different structure than that of CHL: it was that of McConnell as the applicant to the NHL. Christie testified that in his mind, CHL's chance for ownership of the franchise was gone after the May 6, 1997 ballot defeat, and the successful franchise applicant at the time of the June 9 meeting was McConnell. It is important to note that Bettman, contrary to Christie's and McConnell's testimony, testified that after the ballot issue failed, he did not consider CHL's application withdrawn, rather, he viewed things as being in a state of flux. In addition, Bettman testified that the application was from the city of Columbus, and there were never two separate applications pending for Columbus.

McConnell's actions as laid out above were not in any way impermissible under the operating agreement. Again, he was allowed to compete against CHL. He was permitted to go to the June 9 meeting and propose an ownership structure different from what was originally contemplated in October 1996. For that matter, any member of CHL could have done so at any time. As to McConnell's state of mind regarding the existence of CHL, we addressed this because it is an example of one of the many events and circumstances that, when added up, led to the demise of CHL.

The above evidence shows that the cause of it being no longer practicable to carry on the business of CHL was the fact that CHL was not the ownership group awarded the NHL franchise. While appellant did breach the CHL operating agreement by unilaterally rejecting the lease proposal, such was not the reason CHL did not become the ownership group. In addition, appellant's actions in unilaterally filing the lawsuits in the name of CHL did not cause the

dissolution of CHL. June 9, 1997 was the deadline for the ownership group to be identified. This ownership group was not CHL. Hence, as of June 9, 1997, the reason for CHL's existence was gone. Hence, anything appellant did in breach of the operating agreement after June 9, 1997 was not a cause of it being no longer practicable to carry on the business of CHL.

■ Given the above, the evidence does not support the trial court's findings and conclusions that appellant wrongfully caused the dissolution of CHL. However, such was not reversible error. As stated above, the evidence supports the finding that it was not reasonably practicable to carry on the business of CHL in conformity with its articles of incorporation and operating agreement. Therefore, granting judgment in favor of appellees on count two of the second amended complaint and decreeing CHL judicially dissolved were proper.

■ The trial court further erred in concluding that appellant could not participate in the winding up of CHL's affairs because it wrongfully caused the dissolution of CHL. However, this too does not constitute reversible error. On August 15, 1998, the trial court journalized an order appointing a liquidating trustee, stating such trustee shall proceed to wind up the affairs of CHL. Hence, it is the liquidating trustee that will wind up the affairs of CHL, not the members of CHL.[5] Accordingly, because no member may participate in the winding up CHL's affairs, it was not reversible error for the trial court to preclude appellant from participating in the winding up of CHL's affairs.

■ Lastly, because appellant did not wrongfully cause the dissolution of CHL, appellant should not have been ordered to bear the costs. It is upon this error only that we reverse the trial court's judgment.

Accordingly, appellant's sixth assignment of error is overruled, in part, and sustained, in part, but only to the extent as set forth above.

In its seventh assignment of error, appellant contends the trial court erred in awarding appellees attorney fees and expenses pursuant to R.C. 2721.09. On June 29, 1998, appellees filed a motion for attorney fees, pursuant to R.C. 2721.09, on counts one and three of the second amended complaint and as damages for breach of contract. On September 2, 1998, the trial court granted appellees $920,244 in attorney fees on counts one and three of the second amended complaint, both of which set forth claims for declaratory relief. Appellant contends the trial court abused its discretion in awarding attorney fees because such fees were not necessary or proper. We agree.

---

5. See R.C. 1705.44 ("Upon application of any member of a dissolved limited liability company * * *, the court of common pleas may wind up the affairs of the company *or* may cause its affairs to be wound up by a liquidating trustee appointed by the court." [Emphasis added.])

In regard to attorney fee awards, Ohio adheres to the so-called "American rule," which requires that each party involved in litigation pay his or her own attorney fees in most circumstances. See *Sorin v. Warrensville Hts. School Dist. Bd. of Edn.* (1976), 46 Ohio St.2d 177, 179, 75 O.O.2d 224, 225, 347 N.E.2d 527, 528–529. Exceptions to this rule include when contractual provisions between parties shift the costs of defending, where there has been a finding of bad faith, and where statutory provisions specifically provide that a prevailing party may recover attorney fees. *Pegan v. Crawmer* (1997), 79 Ohio St.3d 155, 156, 679 N.E.2d 1129, 1129–1130; *Krasny–Kaplan Corp. v. Flo–Tork, Inc.* (1993), 66 Ohio St.3d 75, 77, 609 N.E.2d 152, 153–154; *Vance v. Roedersheimer* (1992), 64 Ohio St.3d 552, 556, 597 N.E.2d 153, 156–157.

In *Motorists Mut. Ins. Co. v. Brandenburg* (1995), 72 Ohio St.3d 157, 648 N.E.2d 488, syllabus, the Supreme Court of Ohio held that R.C. 2721.09 authorizes trial courts to assess attorney fees based on a declaratory judgment. R.C. 2721.09 states:

"Whenever necessary or proper, further relief based on a declaratory judgment or decree previously granted may be given."

The Supreme Court stated that under the above statutory provision, the only limitation placed upon a trial court in granting such further relief is that such relief must be necessary or proper. *Brandenburg* at 160, 648 N.E.2d at 490–491. The trial court's grant or denial of a request for attorney fees will not be disturbed absent an abuse of discretion. *Id.* at syllabus. Abuse of discretion implies a decision that is without a reasonable basis or one that is clearly wrong. *Wise v. Ohio Motor Vehicle Dealers Bd.* (1995), 106 Ohio App.3d 562, 565, 666 N.E.2d 625, 627; *Angelkovski v. Buckeye Potato Chips Co.* (1983), 11 Ohio App.3d 159, 161–162, 11 OBR 242, 243–245, 463 N.E.2d 1280, 1282–1284. Here, the trial court granted attorney fees based upon the declaratory judgments rendered in appellees' favor on counts one and three of the second amended complaint. We must determine whether the trial court abused its discretion in granting such fees.

As stated above, the only limitation upon a trial court in granting attorney fees is that such an award be necessary or proper. The Supreme Court has not specifically defined "necessary or proper." As a general matter, the Supreme Court has stated that by its clear terms, the intent of R.C. 2721.09 (affording further relief in declaratory judgment actions) is to provide the trial court with the authority to enforce its declaration of right. *Brandenburg* at 159– 160, 648 N.E.2d at 489–491. The operation of the statute is not conditioned on the parties' conduct or on who prevails in the underlying action. *Id.* at 160, 648 N.E.2d at 490–491. In addition to these general principles, the facts in the

*Brandenburg* case give us guidance as to when attorney fees are necessary or proper.

In *Brandenburg,* the insureds had submitted a claim for uninsured motorists coverage. *Id.* at 157, 648 N.E.2d at 488. The insurance company denied the claim and after the insureds requested arbitration of their claim, the insurance company brought a declaratory judgment action against the insureds seeking a determination that it was not obligated to provide coverage under the policy. The trial court granted summary judgment in favor of the insureds, concluding the insureds were entitled to coverage. *Id.* at 158, 648 N.E.2d at 489. The insureds were subsequently awarded $10,339.15 in attorney fees. *Id.*

In finding the trial court did not abuse its discretion in awarding attorney fees, the Supreme Court pointed out that the trial court had recognized the anomalous result that may arise in the type of case before it. *Id.* at 160, 648 N.E.2d at 490–491. After the appeal of the declaratory judgment action, the parties settled their claims for $2,000. *Id.* The Supreme Court stated that to effect this recovery of $2,000, the insureds were forced to retain counsel and expend at least $10,339.15. *Id.* The Supreme Court pointed out that under these circumstances, the insureds would have been better off without insurance. *Id.*

The facts in the above case illustrate a circumstance where further relief in the form of attorney fees was necessary or proper. Had no attorney fees been awarded, the insureds would have been worse off than if a declaration of their rights had never been made. In this situation, the trial court's authority to enforce its declaration would have been meaningless. Further, litigation was required in order for the insureds to obtain coverage. As will be seen, we are not presented with an analogous situation in the case at bar.

Another case that illustrates when attorney fees in a declaratory judgment action are necessary or proper is *Culberson Transp. Serv., Inc. v. John Alden Life Ins. Co.* (June 30, 1997), Franklin App. No. 96APE11–1501, unreported, 1997 WL 358857. In *Culberson,* an action was brought seeking a declaration as to the effect of a mortgage and joinder in mortgage on the fee simple interest in certain property held at various times by the plaintiffs. The trial court granted judgment in favor of the plaintiffs, finding the mortgage and joinder in mortgage did not extend to their fee simple interest in the property. *Id.* at *2. The trial court also granted the plaintiffs attorney fees. *Id.*

On appeal, the defendant argued that an award of attorney fees was unsupportable because there was no bad faith in undertaking the litigation, and such litigation involved two commercial entities of comparable resources and sophistication. *Id.* at *6. This court noted that a trial court has wide discretion in tailoring relief as "necessary and proper." *Id.* The trial court appeared to have awarded attorney fees largely on the basis that no other alternative was available

to the plaintiffs to remove the cloud from title to their property. *Id.* This court found no abuse of discretion in awarding attorney fees on this basis. *Id.* at *6.

We are mindful of a trial court's wide discretion in tailoring relief as necessary or proper in declaratory judgment actions. However, the bases for the trial court's award of attorney fees in the case at bar do not equate with the necessary or proper requirement set forth in R.C. 2721.09. For this reason, we find the trial court abused its discretion in awarding appellees attorney fees.

The trial court's stated reasons for awarding attorney fees here were (1) if appellees had not filed this action, appellant would have instigated its suit on the same matter(s) in New York, (2) appellees had no choice but to file this suit in order to protect their NHL franchise and to ensure immediate commencement of the arena, (3) during the course of the litigation, appellant focused its efforts on trying to resolve the issues in any other possible jurisdiction, and (4) despite the clear language in section 3.3 of the operating agreement, appellant "left no doubt [it] did not intend to abide by the totally lucid language of that provision" and, instead, mounted a legal challenge on "grounds that can only be described as specious." These reasons simply do not support a finding of necessary or proper as contemplated by R.C. 2721.09.

The reasons stated by the trial court in large part go to the tactical choices made by the parties in the course of this litigation. In *Brandenburg* and *Culberson*, the bases for finding attorney fees were necessary or proper lay in the fact that without a declaration, the insureds in *Brandenburg* would not have coverage under their insurance policy and the plaintiffs in *Culberson* would have a cloud on their title. In those cases, the insurance company and the mortgagee essentially "possessed" what the insureds and plaintiffs sought in the litigation. Therefore, the insureds and plaintiffs in *Brandenburg* and *Culberson* needed a declaration that they were entitled to such "property" (in *Brandenburg*, the insureds sought, as a practical matter, $2,000 and in *Culberson*, the plaintiffs sought to lift the cloud from their title). In short, the declarations sought in those cases were necessary in order to change the status quo. Attorney fees expended in acquiring such declarations were necessary or proper to afford meaningful relief.

The case at bar is distinguishable. Appellees were in possession of the hockey franchise. The only reason appellees filed this suit was because they believed appellant would file suit on these same issues. The fact that appellant was threatening suit in New York (and indeed did file suit in New York) does not mean appellees *had* to file this suit in order to protect their interest in the hockey franchise and arena. Rather, appellees' decisions to file a declaratory judgment action and to file such in Ohio were purely tactical decisions. While such decisions may have proved resourceful, they were not necessary in order to

change or preserve the status quo. Had appellant "beat appellees to the courthouse" by filing a complaint for breach of contract and breach of fiduciary duty and given the actual result as to such issues in the case at bar, neither party would have been entitled to attorney fees. Simply because appellees made a tactical move and filed a declaratory judgment action does not automatically mean they are entitled to attorney fees under R.C. 2721.09. Tactical decisions do not equal necessary or proper as contemplated by the statute.

The trial court also indicated that appellant's efforts throughout the litigation were focused not on a resolution of the issues but on trying to resolve the issues in any other venue. Appellant's actions in attempting to litigate the issues in a different forum were not only tactical decisions, they were tactical decisions that every litigant has the right to make. To use this as a basis for awarding attorney fees is unjust. In addition, we must point out that contrary to the trial court's statement, the record shows that appellant's focus during the litigation was, in essence, on winning its case—not on attempting to litigate it elsewhere.

■ Finally, it is clear that the trial court based its decision to award attorney fees, in part, on a belief that appellant's position on the core issue in the case (the meaning of section 3.3 of the operating agreement) was specious. This belief is not only inaccurate, it is an improper basis upon which to award attorney fees. Appellant presented legitimate issues below and upon appeal. More importantly, and as the Supreme Court alluded to in *Brandenburg*, the award of attorney fees pursuant to R.C. 2721.09 is not dependent upon who wins or loses or upon the relative strength of the parties' positions. *Brandenburg* at 160, 648 N.E.2d at 490–491. The trial court's stated basis here touches on a finding of bad faith. Even if bad faith could be relevant in determining the necessity or propriety of attorney fees in declaratory judgment actions, no bad faith is present here. The trial court's decision granting attorney fees on this basis was wrong.

In summary, there was no basis for finding attorney fees were necessary or proper. The trial court's stated reasons for granting attorney fees in this case were incorrect. Contrary to the trial court's conclusion, appellees did not have to file the present suit in order to protect their interests in the hockey franchise and arena. The fact that appellant would have filed suit in New York on the same issues had appellees not first filed suit here has no bearing on appellees' ability to protect their interests. Appellees were simply making a tactical decision. The trial court and for that matter, appellees, were wrong in asserting that the circumstances involved anything but such a decision. Further, appellant's positions on the underlying issues were legitimate, and its actions below were entirely proper.

For these reasons, the trial court abused its discretion in awarding attorney fees pursuant to R.C. 2721.09. Accordingly, appellant's seventh assignment of error is sustained.

In summary, appellant's first, second, third, fourth, and fifth assignments of error are overruled. As a result, CHL's "conditional" assignments of error are rendered moot. Appellant's sixth assignment of error is overruled in part, and sustained in part, but only to the extent that the trial court erroneously ordered that appellant bear the costs related to such claim. Appellant's seventh assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is affirmed in part, and reversed in part, as to the judgment ordering appellant to bear costs for count two of the second amended complaint and as to the judgment awarding appellees attorney fees.

*Judgment affirmed in part*
*and reversed in part.*

BOWMAN, J., concurs.

PEGGY BRYANT, J., concurs in part and dissents in part.

PEGGY BRYANT, Judge, concurring in part and dissenting in part.

Being unable to agree fully with the majority's opinion, I respectfully dissent in part.

I am unable to concur in the majority's disposition on the seventh assignment of error. In that error, appellant does not challenge the amount of attorney fees the trial court awarded to appellees. Rather, appellant contends the trial court erred in awarding attorney fees at all under the standard set forth in the Supreme Court's opinion in *Motorists Mut. Ins. Co. v. Brandenburg* (1995), 72 Ohio St.3d 157, 648 N.E.2d 488.

In *Brandenburg,* the Supreme Court noted the language of R.C. 2721.09, which states that "[w]henever necessary or proper, further relief based on a declaratory judgment or decree previously granted may be given." Interpreting that language to authorize trial courts to assess attorney fees in a declaratory judgment action, the Supreme Court in *Brandenburg* stated that the trial court's authority is limited only in that the relief must be necessary or proper. Given the broad authority the trial court possesses in determining whether attorney fees are necessary or proper, the trial court's determination will be set aside only on an abuse of discretion. *Id.*

Here, the trial court stated several reasons for awarding attorney fees, but in particular determined that appellees had no choice but to file a declaratory

judgment action in Columbus in order to protect their NHL franchise and to ensure immediate commencement of the arena. Because that rationale and the facts in the record support an award of attorney fees in this case, I would overrule the assigned error.

According to the evidence presented at trial, on June 16, 1997, Lamar Hunt sent a letter to the NHL with copies to at least some of appellees. Hunt's letter noted the dispute between him and John McConnell, indicated Hunt's belief that McConnell's actions constituted a breach of contract and fiduciary duty, and reiterated Hunt's continuing interest in securing a franchise for CHL. Hunt requested that the NHL refrain from processing any competing application McConnell submitted until the dispute between McConnell and Hunt was resolved.

John Wolfe's testimony at the attorney fees hearing corroborated the dispute, stating that appellees filed the declaratory judgment action because Hunt had sent threatening letters that claimed appellees' actions in seeking a franchise were improper. Wolfe testified he was afraid the franchise award to Columbus was in jeopardy, rendering difficult the plans to proceed with construction of the arena. He noted that Hunt's June 16 letter clearly indicated appellant was going to try to block COLHOC from getting the franchise, and that Hunt had the potential of severely limiting the NHL's ability to grant the franchise to Columbus. As a result, appellees filed suit on June 17 in Columbus. On June 25, 1997, Columbus, Ohio was awarded a franchise through COLHOC.

In early July 1997, appellant filed suit in the state of New York against the NHL, Nationwide Mutual Insurance Company, John H. McConnell, John P. McConnell, Wolfe Enterprises, Inc., and Pizzuti Sports, Ltd. In that complaint, appellant and CHL alleged that CHL's application and fee, submitted in compliance with NHL terms and conditions, created a contract pursuant to which the NHL agreed to consider CHL's application, and that an implicit term of that contract was the NHL's agreement not to accept applications submitted after the November 1, 1996 application deadline award and ultimately not to grant NHL expansion franchises to parties who had not submitted applications in compliance with the NHL's terms and conditions.

The New York lawsuit alleged that because neither McConnell nor COLHOC had submitted any such application, nor supplied the required $100,000 application fee before June 16, 1997, neither satisfied the NHL's terms and conditions, and that by announcing its award to those interests, the NHL breached its contractual obligations with the CHL, causing CHL to suffer irreparable harm if appellees are allowed to maintain the franchise. Accordingly, in that litigation, appellant and CHL sought to enjoin the NHL from granting an NHL expansion franchise for Columbus, Ohio to appellees or allowing any person other than CHL

to obtain and maintain such an NHL expansion franchise. By amended complaint, appellant and CHL also sought to impose a constructive trust for the benefit of appellant and CHL on the ownership, profits, and proceeds to be derived from COLHOC's ownership and operation of an NHL franchise.

Despite the foregoing evidence, the majority finds the award of attorney fees not necessary or proper. Comparing the foregoing facts to those set forth in *Brandenburg,* the majority concludes that *Brandenburg* cannot support an award of fees. While I agree that the facts of *Brandenburg* do not parallel those here, *Brandenburg* does not set forth the factual parameters for an award of attorney fees under the Declaratory Judgments Act; rather, it announces only the legal principle that fees may be awarded if the action is necessary or proper. Indeed, in a factual situation strikingly dissimilar from *Brandenburg,* this court affirmed the award of attorney fees. *Culberson Transp. Serv., Inc. v. John Alden Life Ins. Co.* (June 30, 1997), Franklin App. No. 96APE11–1501, unreported, 1997 WL 358857.

In *Culberson,* the plaintiff filed an action in declaratory judgment and to quiet title, seeking a declaration that the mortgage and joinder in mortgage, executed in favor of defendant, did not attach to the fee simple interest in the property at issue. The trial court awarded attorney fees to plaintiffs; on appeal, defendant contested the award. In refusing to set aside the award, this court noted that "our latitude does not include substituting our judgment for that of the trial court. A trial court addressing a declaratory judgment action under R.C. 2721.09 has wide discretion in tailoring relief as 'necessary and proper.' The trial court in this matter appears to have awarded fees largely on the basis that no other alternative was available to appellees in order to remove the cloud from title to their property. We find no abuse of discretion—on the part of the trial court in awarding fees on this basis." *Id.* at *6.

The facts here may not present a "cloud on the title," as that term is used in real estate litigation, to appellees' rights in the NHL franchise. Nonetheless, the facts developed in the trial court reflect a "cloud," or potential impairment, on appellees' rights to the franchise: before the franchise was awarded, appellant through Hunt had made clear its intent to attempt to block the award, and subsequent to the award appellant instituted litigation in New York designed to prevent appellees from obtaining and maintaining ownership rights in the franchise. With the franchise in question, the propriety of proceeding with the arena likewise was in question; and if the arena was not built, the franchise was in jeopardy because the NHL would not award the franchise without an arena.

"[D]eclaratory judgment is a remedy in addition to other legal and equitable remedies and is to be granted where the court finds that speedy relief is necessary to the preservation of rights which might otherwise be impaired."

*Arbor Health Care Co. v. Jackson* (1987), 39 Ohio App.3d 183, 186, 530 N.E.2d 928, 931–932, citing *Herrick v. Kosydar* (1975), 44 Ohio St.2d 128, 73 O.O.2d 442, 339 N.E.2d 626. The facts here present the need for speedy relief to determine that the awarded franchise would remain with appellees, and that the plans to immediately construct an arena would not be futile. Had appellees refrained from filing the present lawsuit, they would be litigating the very issues in New York, outside the context of declaratory judgment where speedy relief is a recognized priority.

In the final analysis, to ensure speedy relief, to finally settle appellees' rights to the NHL franchise, and to allow with the immediate construction of the necessary arena, the trial court properly could find on this record that appellees properly sought declaratory relief in Columbus. Unquestionably, appellees also received the benefit of litigating this action in a local forum. Nonetheless, that additional factor does not undermine the legal propriety of bringing the action under the Declaratory Judgments Act to remove the questions appellant had created in appellees' rights to the NHL franchise.

Because the trial court cited those very concerns in ascertaining appellees' rights to attorney fees, I am unable to find the trial court abused its discretion in awarding those fees. To hold otherwise substitutes our judgment for that of the trial court. Accordingly, I would overrule appellant's seventh assignment of error.