OPINION
Plaintiff-appellant, Bradford L. Kitchen ("Kitchen"), appeals from the July 31, 2001 judgment entry of the Franklin County Court of Common Pleas denying plaintiff's objections to the magistrate's findings of fact and conclusions of law, and approving and adopting the magistrate's findings of fact and conclusions of law and future compensation decision. For the reasons that follow, we affirm in part and reverse in part.
Defendant-appellee, Welsh Ohio, LLC ("Welsh"), is a commercial real estate broker involved in the purchase, sale, and leasing of commercial real estate on behalf of its clients. Welsh employed Kitchen, a licensed real estate salesperson, from October 7, 1998 until July 29, 1999. At his previous employer, Matrix Real Estate Advisors, Kitchen began efforts to win the Huntington National Bank ("Huntington") corporate account. Kitchen realized that in order to acquire such a large account, he needed more resources than were available at Matrix. Kitchen entered into negotiations with Welsh and shared with them his plans to obtain the Huntington account. Welsh offered Kitchen a position, and Kitchen accepted.
Kitchen's employment relationship with Welsh was governed by two documents, an October 6, 1998 letter agreement written by Michael E. Young, Managing Director of Welsh, and an October 7, 1998 Employee Broker agreement. The letter agreement provided that Kitchen's title would be vice-president of Corporate Services, and defined his job responsibilities as follows:
 Provide leadership in the Columbus, Ohio office for corporate services on a regional basis. You will work closely with me and Kevin Farrell in identifying targets, strategizing for the attack and winning the business. All the resources of Welsh Companies will be at your disposal, including administrative support, research, asset management, facilities management, construction, development, mortgage brokerage, leasing and sales, etc. We will look to you to serve as the principal "rainmaker" responsible for developing long-term corporate services relationships. [Appellant's brief, exhibit No. A-21.]
The letter agreement included the following provisions for Kitchen's compensation structure:
 We realize the risk associated with any transition from one firm to another and have structured the following compensation plan to dampen any fluctuations in cash flow. Specifically, your first year compensation will be as follows:
Salary: $75,000
 Bonus: 70% of gross in-house fees greater than $150,000 generated after co-op split
Your compensation after year one will be as follows:
Salary: $75,000
 Bonus: 60% of gross in-house fees generated after co-op split between $150,000 and $200,000
 65% of gross in-house fees generated after co-op split greater than $200,000 and less than $600,000
 70% of gross in-house fees generated after co-op split greater than $600,000. [Appellant's brief, exhibit No. A-21.]
In addition to providing specific provisions regarding Kitchen's employment at Welsh, the letter agreement also directed Kitchen to "thoroughly review and sign the enclosed Employee Broker Agreement."
The Employee Broker Agreement, signed by the parties on October 7, 1998, contained the following provision with regard to compensation:
 All services performed by the Employee shall be compensated by payment of a portion of the brokerage fee charged by Welsh as set forth below. When the Employee shall have performed any work hereunder, said fee when collected by Welsh shall be divided between Welsh and Employee in the manner set forth in a written policy statement to be prepared by Welsh, as amended by Welsh from time to time. [Appellant's brief, exhibit No. A-24.]
The Employee Broker Agreement also contained the following provision regarding payment of brokerage fees to an employee after termination of the employment relationship:
 When Employee's employment has been terminated for any reason, the Employee's regular proportionate share of Brokerage fees on any transactions Employee has made that are not closed shall be considered Employee's property, and upon closing of said transactions, said proportionate share of the Brokerage fee shall be paid to Employee. In the event Employee leaves and has transactions or listings pending that require further work normally rendered by Employee, the Employee and Welsh, or Welsh alone, shall make arrangements with another Employee in the organization to perform the required work, and the Employee assigned shall be compensated for taking care of pending transactions or listings. [Appellant's brief, exhibit No. A-25.]
While employed at Welsh, Kitchen was instrumental in getting the Huntington to select Welsh as its outsource partner for providing corporate real estate services. In addition to playing a large part in acquiring the Huntington account, Kitchen worked many hours developing a database and servicing the account.
In the summer of 1999, Kitchen began to believe that he was being squeezed out of his relationship with Huntington. Kitchen was terminated from Welsh after a confrontation in the lobby of the Huntington Center when he was denied access to a meeting with the client.
Kitchen filed a lawsuit after his departure from Welsh, alleging that: (1) Welsh breached its contract by failing to compensate Kitchen pursuant to the parties' agreement; and (2) Welsh converted Kitchen's property by failing to return Kitchen's files and notes. Kitchen requested money damages and declaratory relief on the contract claim.
The trial court severed the declaratory judgment claim for trial at a later date. The contract claim involving real estate transactions that were closed and paid prior to trial was tried to a jury on July 27, 2000, and was the subject of a previous appeal before this court. Kitchen v. Welsh Ohio, LLC (June 12, 2001), Franklin App. No. 00AP-1256 ("Kitchen I"). In that case, a panel of this court reversed a jury award that Welsh pay Kitchen $343,881.52 in damages for breach of contract and conversion. The matter was remanded for a new trial, in part because this court could not ascertain from the record how the jury found breach of contract liability and imposed damages.
The portion of the case that is the subject of the instant appeal involves the issue of compensation for real estate transactions that had not closed as of the date of trial. The matter was referred to a magistrate for a jury-waived trial.
The magistrate divided Kitchen's claims on particular real estate deals into various categories including claims Welsh conceded, claims that were precluded or affected by the jury verdict, claims that were moot or satisfied, claims that involved automatic or no-fee lease renewals, claims that were terminated by the Huntington and later reassigned, and a claim involving the purchase of commercial database software. The magistrate found in favor of Kitchen on certain issues and in favor of Welsh on others. Appellant filed objections, and the trial court overruled all objections approving and adopting the magistrate's findings of fact and conclusions of law.
Kitchen filed a timely notice of appeal assigning as error the following:
 I. THE TRIAL COURT ERRED IN APPROVING AND ADOPTING THE DECISION OF THE MAGISTRATE BECAUSE THE MAGISTRATE'S DECISION DOES NOT ADDRESS ALL THE PROJECTS UPON WHICH KITCHEN MADE A CLAIM.
 II. THE TRIAL COURT ERRED IN FAILING TO FIND AND CONCLUDE THAT KITCHEN WAS TO BE COMPENSATED ON THE HUNTINGTON NATIONAL BANK CORPORATE SERVICES PROJECTS.
 A. THE TRIAL COURT ERRED IN FAILING TO FIND AND CONCLUDE THAT KITCHEN MADE THE TRANSACTION WITH THE HUNTINGTON NATIONAL BANK AND THAT KITCHEN SHOULD BE COMPENSATED FOR ALL FEES WHICH FLOW FROM THE HUNTINGTON CORPORATE SERVICES ACCOUNT.
 B. AT THE MINIMUM, KITCHEN SHOULD BE COMPENSATED ON ALL REAL ESTATE PROJECTS THAT WERE "IN THE WORKS" DURING HIS TENURE AT WELSH.
 C. KITCHEN SHOULD BE COMPENSATED ON ALL REAL ESTATE PROJECTS THAT WERE IN THE WORKS DURING HIS TENURE AT WELSH, EVEN IF THEY WERE SUBSEQUENTLY INACTIVE AND THEN REACTIVATED.
 D. KITCHEN SHOULD RECEIVE A COMMISSION ON RENEWALS WHERE VALUE HAS BEEN ADDED AND/OR WHERE WELSH RECEIVES COMPENSATION ON A LEASE RENEWAL.
 E. KITCHEN SHOULD RECEIVE COMPENSATION ON COMPUTER TECHNOLOGY RELEVANT TO REAL ESTATE PROJECTS AS HE WAS INVOLVED IN ITS DEVELOPMENT.
 F. KITCHEN SHOULD RECEIVE COMPENSATION ON THOSE REAL ESTATE PROJECT [sic] THAT DEFENDANTS FALSELY REPRESENTED AT TRIAL TO COUNSEL AND/OR THE JURY THAT THE PROJECTS HAD NOT CLOSED AND/OR FOR WHICH DEFENDANTS HAD NOT YET RECEIVED COMPENSATION.
 G. KITCHEN SHOULD BE COMPENSATED THROUGHOUT THE LIFETIME OF THE WELSH AND HUNTINGTON AGREEMENT.
 III. THE TRIAL COURT ERRED IN FAILING TO FIND AND CONCLUDE IN ACCORDANCE WITH THE LANGUAGE IN THE CONTRACTS.
 A. KITCHEN SHOULD NOT HAVE $150,000 ANNUALLY DEDUCTED FROM HIS COMPENSATION PURSUANT TO THE TERMS OF HIS CONTRACT; KITCHEN SHOULD BE COMPENSATED AT 50% OF THE BROKERAGE FEE ON THE FIRST $150,000.00 OF GROSS IN-HOUSE FEES.
 B. KITCHEN SHOULD NOT HAVE THE SALARIES AND/OR EXPENSES OF WELSH EMPLOYEES DEDUCTED FROM HIS COMPENSATION PURSUANT TO THE TERMS OF HIS CONTRACT.
 IV. THE TRIAL COURT ERRED IN FAILING TO COMPEL THE DISCOVERY REQUESTED FROM DEFENDANTS AND THIRD PARTIES.
Subsections A and G of Kitchen's second assignment of error raise a threshold issue as to the interpretation of the parties' agreement and, accordingly, we address this question first. Our standard of review when reviewing an appeal from a decision of a trial court adopting a magistrate's decision under Civ.R. 53(E)(4) is whether the trial court abused its discretion. George Thomas Contractor, Inc. v. Hackmann (Mar. 8, 2001), Franklin App. No. 00AP-877.
However, the construction of a written contract is a matter of law for the court. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241; McConnell v. Hunt Sports Ent. (1999), 132 Ohio App.3d 657, 675. Generally, the terms of a contract are to be given their ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall content of the contract. Shifrin v. Forest City Ent., Inc. (1992), 64 Ohio St.3d 635, 638; McConnell, supra. When the terms of the contract are unambiguous and clear on their face, the court does not need to go beyond the plain language of the contract to determine the rights and obligations of the parties and the court must give effect to the contract's express terms. DiGioia Bros. Excavating, Inc. v. Cleveland Dept. of Pub. Util., Div. of Water (1999),135 Ohio App.3d 436, 446. A writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth. (1997),78 Ohio St.3d 353, 361; McConnell, supra; EFA Associates, Inc. v. Dept. of Admin. Serv., Franklin App. No. 01AP-1001, 2002-Ohio-2421.
At the jury trial, the initial appeal to this court, the memorandum in support of jurisdiction before the Ohio Supreme Court, the trial to the magistrate, and in this appeal, Kitchen has asserted that because he made the relationship between Welsh and the Huntington possible, in effect having "made" the corporate transaction, he therefore had the right to receive compensation on all future Huntington real estate transactions after his termination as long as Welsh continued to have a relationship with the Huntington. The magistrate, the trial court, and this court, all either explicitly or implicitly disagreed with this position finding that Kitchen could only receive compensation for particular real estate transactions.
Provision 4.4 of the Employee Broker Agreement addressed the issue of Kitchen's compensation after termination of the employment relationship. The provision provided that upon termination "[Kitchen's] regular proportionate share of Brokerage fees on any transactions [he] has made that are not closed shall be considered [Kitchen's] property, and upon closing of said transactions, said proportionate share of the Brokerage fee shall be paid to [him]."
As this court stated in Kitchen I, Kitchen is entitled to brokerage fees on any "transactions" that he "has made." This court concluded that there was insufficient evidence that Kitchen made a specific transaction involving the lease of space by Ernst Young at the Huntington Center, 41 South High Street in downtown Columbus, Ohio. Kitchen's only connection to the Ernst Young transaction was a general discussion regarding the concept of relocating operations from the Huntington Center in order to free up office space for the lease. Kitchen I, supra.
We find no support in the express language of the contract for Kitchen's argument that after his termination he was to be compensated for any and all Huntington transactions throughout the life of the Welsh and Huntington agreement. Rather, the Employee Broker Agreement specifically addressed Kitchen's compensation upon termination of his employment, and the pertinent provision merely provides for his regular proportionate share of brokerage fees on transactions he has made that are not closed. While Kitchen was "responsible for developing long term corporate services relationships," as stated in the letter agreement, it is clear from reading the two documents together that apart from his salary, his compensation was tied to specific transactions that he made.
In his alternative position, Kitchen argues that he should be compensated for all real estate projects that were "in the works" during his tenure at Welsh. Kitchen defines "in the works" as those transactions that were even in the discussion stage. We believe this argument has already been answered in the negative by this court in Kitchen I, when it found insufficient evidence that Kitchen made the Ernst Young transaction. In addition, Huntington real estate manager, Martha Hubbell, testified that the Huntington in no way expected Welsh to proceed on potential transactions on the basis of preliminary discussions. (Tr. Vol. III of VIII, at 459-460.)
Kitchen also asserts that he should be compensated on all real estate projects that were "in the works" during his tenure even if they were subsequently inactive and then reactivated. Kitchen reiterates his earlier argument that he should be compensated for the projects because he initially made the Huntington relationship and/or was involved with the project. Kitchen also argues there are technical difficulties in implementing such a ruling because of a lack of paperwork, and an inability to determine whether a project was dropped intentionally or inadvertently. Kitchen testified that, "[o]ftentimes, as properties were being prepared for marketing, they would come off the list sometimes. Then come back on. Be put on hold whether awaiting for some approvals internal in the bank or for other reasons, and then they would be put back on the list once they were ready to be marketed." (Tr. Vol. VI of VIII, at 935.)
Martha Hubble testified about transactions that were terminated and subsequently reactivated. She said: "For example, the second one listed, Clearwater Beach, when we initially looked at this facility, we determined that at the time it wasn't financially feasible for us to move forward with making the space marketable. This year, with this year's budget, we feel that we can spend those funds. And it was reassigned, and we asked Welsh to hire a broker and try to lease it out." (Tr. Vol. III of VIII, at 462.)
The magistrate concluded that Kitchen had not made such transactions as he did no work to secure the second assignments from Huntington to Welsh and did no work to carry out the transactions. We agree. Given our earlier opinion, it is clear that, upon termination, Kitchen was only entitled to compensation for transactions he had made. Transactions that were inactive while he was employed and only reactivated after his termination were not transactions he made.
Kitchen argues that such a ruling encourages Welsh to have projects dropped from transaction update lists to avoid paying fees to Kitchen. Kitchen has not pointed to any evidence that such a practice occurred or is occurring. While we have reviewed the transcript in analyzing this case, it is not the duty of this court to comb the record in search of the evidence necessary to sustain Kitchen's claimed error. As a result, no error having been shown, we reject this argument. See App.R. 12(A)(2).
Kitchen next argues that he should receive commissions on lease renewals where value has been added and/or where Welsh has received compensation on a renewal. Welsh received no commission on lease renewals when all it did was send a letter of renewal or a notice of exercise of an option to renew. However, if value was added to a lease renewal, Welsh received a three percent commission. Typically, value was added when the Huntington asked Welsh to go out, obtain current market information, and renegotiate a new rate. (Tr. Vol. III of VIII, at 468.)
At the risk of sounding repetitive, Kitchen's compensation upon termination is governed by the Employee Broker Agreement that provided for payment of fees on transactions that Kitchen had made that had not closed at the time of his termination. Kitchen did nothing to "make" the value added lease renewals and, accordingly, is not entitled to compensation.
Kitchen next argues that he should be compensated for computer projects including purchase of database software that he was involved with during his tenure with Welsh. Kitchen points to the letter agreement that provides he is to receive a bonus of 60 percent of gross in-house fees generated after co-op split. He argues this applies to all fees, not just real estate fees.
This argument ignores the unambiguous language of the contract that provides for Kitchen to receive his regular proportionate share of brokerage fees upon termination of employment. Kitchen himself testified the payment that came to Welsh from Huntington was a reimbursement for the cost of constructing the database. (Tr. Vol. II of VIII, at 191.) Reimbursement for software expenses incurred by Welsh to create the database is not within the scope of Provision 4.4 of the Employee Broker Agreement that governed Kitchen's compensation upon termination.
Finally, with respect to the second assignment of error, Kitchen argues that Welsh changed its position from what it represented at the jury trial concerning certain projects that had not closed or for which Welsh had not received payment. At the trial before the magistrate, Kitchen testified on redirect examination that Welsh had changed its position and Welsh was now claiming that it had been paid prior to trial.
Since there is to be a new trial, and these transactions were previously submitted to the jury, these arguments are more appropriate for resolution on the remanded portion of the case. The second assignment of error is not well-taken and is overruled.
In his first assignment of error, Kitchen asserts, and Welsh concedes, that there were 27 transactions not specifically referenced by the magistrate in his decision or addressed by the trial court. Welsh, however, asserts that all the transactions were impliedly rejected by the magistrate as they either were or could have been presented to the jury or they were not assigned to Welsh by Huntington until after Kitchen was terminated.
Welsh contends that before the magistrate, it submitted evidence that Kitchen should not receive compensation for the 27 transactions. Welsh directs us to defendant's exhibit S that lists transactions that Welsh claimed were previously adjudicated, and defendant's exhibit V that lists transactions that were allegedly not made by Kitchen. However, transaction number 134 (as numbered in plaintiff's exhibit No. 4), 105 W. 4th Street in Cincinnati, does not appear on either of those exhibits.
Welsh also argues that Kitchen invited the error by informing the magistrate that he did not need to look at each transaction. We do not believe that Kitchen invited the error, as he has consistently maintained throughout this litigation that he should be compensated on all the business of the Huntington account regardless of when it closed or when it was assigned. If the magistrate had accepted Kitchen's argument, an itemized accounting would not have been necessary. However, because the trial court and the magistrate correctly ruled that Kitchen's employment agreement cannot be read so expansively, it became necessary to look at individual transactions to determine whether they were transactions that Kitchen had made.
It is the responsibility of the trier of fact to assess the credibility of the evidence presented. During the course of our review, we have been guided by the principle that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The underlying reason for deference is that the trier of fact is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and to use these observations in weighing the credibility of the proffered testimony. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
Here, there was evidence submitted concerning these transactions, but the magistrate did not make any findings. Thus, we sustain the assignment of error and remand the matter to the trial court to make findings of fact and conclusions of law with respect to each of the 27 transactions.
In his third assignment of error, Kitchen argues that $150,000 of brokerage fees should not be deducted from the gross in-house fees prior to any brokerage fee split entered into by Kitchen and Welsh. Kitchen attempts to raise in this appeal an issue that the magistrate did not address in his decision and that was the subject of a special interrogatory in the jury trial. The trial court found that the issue was not properly before the magistrate, and we agree. This issue is one that must be resolved on the portion of the case that was remanded in Kitchen I.
Kitchen also argues the magistrate incorrectly determined that Kitchen's compensation "shall be subject to set off for actual salary expenses incurred for Welsh employees who perform the `required work .in taking care of pending transactions or listings.'" (Magistrate's decision, at 5.) At issue is provision 4.4 of the Employee Broker Agreement that states, in pertinent part: "the Employee and Welsh, or Welsh alone, shall make arrangements with another Employee in the organization to perform the required work, and the Employee assigned shall be compensated for taking care of pending transactions." Welsh argues the compensation should come from Kitchen's share of the brokerage fees, and Kitchen argued that the agreement does not specify whether the compensation should come from Kitchen or Welsh. This issue was litigated at the jury trial, and was the subject of a special interrogatory. The jury found that Kitchen should not have the salaries of Welsh employees deducted from his compensation.
The magistrate heard evidence as to what Kitchen testified to in his deposition concerning this issue as well as a witness for Welsh testifying that the industry practice was to deduct the expenses from the terminated employee's commission. Kitchen admitted that, during his deposition, his understanding was that the cost of taking care of pending transactions or listings would be deducted from the share of brokerage fees to which he would otherwise be entitled. (Tr. Vol. III of VIII, at 594.) The magistrate concluded that the salary expenses should be set off against Kitchen's share of brokerage fees.
The trial court did not specifically address this objection as it apparently found this issue was also outside the scope of the magistrate's decision. If the trial court did indeed believe the parties were attempting to relitigate an issue that had been resolved at the jury trial, the trial court did not modify the portion of the magistrate's decision in which he ordered the set off. See Civ.R. 53(E)(4)(b) ("the court may adopt, reject, or modify the magistrate's decision").
We find the issue was appropriate for the declaratory judgment action as it directly affected the issue of future damages on transactions that had not closed. We also find the portion of the contract dealing with the set off to be ambiguous. However, after reviewing the testimony and evidence, we conclude that the magistrate did not abuse his discretion in finding in favor of Welsh on the issue of set off. The third assignment of error is not well-taken and is overruled.
In his fourth assignment of error, Kitchen argues the magistrate erred in failing to compel discovery requested from Welsh and third parties. In the declaratory judgment discovery stage of this matter, Kitchen requested supplementation of his previous discovery requests and submitted additional interrogatories and requests for production of documents. Welsh objected to some of the requests, and counsel met with the magistrate to address discovery issues. The magistrate issued an order on September 22, 2000, ordering Kitchen to identify the transactions he made and requiring Welsh to supplement discovery. The magistrate sustained certain of Welsh's objections to discovery. The parties supplemented discovery, and Welsh's counsel represented that his client had fully complied with the magistrate's order, but Kitchen was not satisfied with Welsh's response. Kitchen filed a motion to compel discovery on September 29, 2000. The record does not contain any indication that the magistrate ever ruled on that motion.
Kitchen contends that Welsh failed to produce or inadequately produced closing statements on all completed transactions, copies of all completed leases, copies of all invoices to landlords and Huntington, copies of all representation and referral agreements for all transactions, copies of all commission calculation forms generated at or before closings on all transactions, monthly or periodic statements of account or correspondence regarding invoices or commissions, all records of when payment was made to Welsh by every client originated or worked upon by Kitchen. Other than claiming certain documents were not produced and the requests were relevant, Kitchen has not explained what the requested documents could reasonably be expected to show with respect to his case or how he was materially prejudiced by the alleged failure to receive the requested discovery.
The regulation of discovery is left to the discretion of the trial judge and, upon appeal to this court, we review assignments of error regarding discovery matters for an abuse of that discretion. State ex rel. Daggett v. Gessaman (1973), 34 Ohio St.2d 55, 57; Alpha Benefits Agency, Inc. v. King Ins. Agency, Inc. (1999), 134 Ohio App.3d 673. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219; see, also, Nakoff v. Fairview Gen. Hosp. (1996),75 Ohio St.3d 254, 256. Absent an abuse of discretion which prejudicially affects a substantial right of the moving party, an appellate court will not reverse a trial court's ruling on a discovery matter. Daggett, at 58; Jaric, Inc. v. Chakroff (1989), 63 Ohio App.3d 506,512.
In the final analysis, the record does not support Kitchen's contention that the magistrate's discovery rulings prevented him from adequately preparing his case. The focus of the magistrate's decision was Kitchen's level of involvement in each of the transactions. Accordingly, Kitchen's challenge to the magistrate's discovery rulings is unpersuasive. The fourth assignment of error is overruled.
Based on the foregoing, Kitchen's first assignment of error is sustained, his second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed in part, reversed in part and remanded for further proceedings in accordance with this opinion.
Judgment affirmed in part, reversed in part; remanded for further proceedings.
BRYANT and DESHLER, JJ., concur.