STATE ex rel. PETRO, Atty. Gen., Appellant,

v.

R.J. REYNOLDS TOBACCO COMPANY et al., Appellees.

[Cite as *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 152 Ohio App.3d 345, 2003-Ohio-1654.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–591.

Decided March 31, 2003.

Jim Petro, Attorney General, Joseph L. Piccin, Susan C. Walker and Michael D. Allen, Assistant Attorneys General, for appellant.

Jones, Day, Reavis & Pogue, Jeffrey J. Jones and Matthew A. Kairis; Jones, Day, Reavis & Pogue, Donald B. Ayer, Daniel H. Bromberg and Jack W. Campbell IV, for appellees.

LAZARUS, Judge.

{¶ 1} Plaintiff-appellant, the state of Ohio ("state"), appeals from the April 26, 2002 decision and judgment entry, and the May 13, 2002 nunc pro tunc entry of the Franklin County Court of Common Pleas denying the state's motion for declaratory relief, concluding that defendant-appellee, R.J. Reynolds Tobacco

Company's ("RJR's"), imprinted matchbooks are not "merchandise" within the context of the tobacco Master Settlement Agreement ("MSA"), and holding that RJR is not in violation of the consent decree entered into on November 25, 1998. For the reasons that follow, we reverse.

{¶ 2}   In November 1998, Ohio and numerous other states settled lawsuits with the five largest tobacco companies, including RJR. The settlement terms were set forth in the MSA, including restrictions on certain types of advertising and a ban on the distribution of tobacco brand-name apparel and merchandise.

{¶ 3}   On March 19, 2001, the state initiated the present action seeking civil contempt sanctions against RJR, contending that RJR's practice of buying advertising space on matchbooks in which it displays its Winston Brand and related promotional messages violated the consent decree implementing the MSA. The state contended that the distribution of paper matchbooks bearing RJR tobacco brands violated the ban on tobacco brand-name merchandise in Section III(f) of the MSA. The state later withdrew its request for contempt sanctions and sought a declaration regarding the terms of the MSA.

{¶ 4}   The parties submitted the following statement of stipulated facts to the trial court:

{¶ 5}   "1. The plaintiff in this action is the State of Ohio (the 'State') through Betty D. Montgomery, the Attorney General of Ohio.

{¶ 6}   "2. Defendant R.J. Reynolds Tobacco Company ('R.J. Reynolds') is a corporation organized under the laws of New Jersey with its principal place of business in Winston Salem, North Carolina.

{¶ 7}   "3. R.J. Reynolds manufactures, markets, and sells cigarettes throughout the United States, including within both the State of Ohio and Franklin County.

{¶ 8}   "4. In November 1998, R.J. Reynolds and four other tobacco companies (Philip Morris Incorporated, Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, and Liggett Group, Inc.) entered into identical settlement agreements with the State of Ohio and 45 other states, four territories, the District of Columbia, and the Commonwealth of Puerto Rico, respectively settling litigation brought by those jurisdictions against R.J. Reynolds and the other tobacco companies.  A copy of this settlement agreement, which is known as the Master Settlement Agreement or MSA, is attached to this stipulation as Exhibit 1. The State and R.J. Reynolds are bound by the terms of the MSA.

{¶ 9}   "5. On November 25, 1998, this Court entered a consent decree approving the MSA in the suit brought by the State of Ohio against R.J. Reynolds and the other tobacco companies.  A copy of that consent decree is attached as Exhibit 2. In the consent decree, this Court retained jurisdiction to enforce the

MSA and the decree. As a consequence, both the State and R.J. Reynolds remain subject to the jurisdiction of this Court in this matter.

{¶ 10} "6. On November 27, 2000, the State of Ohio and fifteen other states informed R.J. Reynolds by letter of their intention to initiate proceedings to enforce the MSA and the consent decrees applicable in each state, asserting that R.J. Reynolds' practice of placing brand names on matchbook covers violated both the MSA and the decree. This letter satisfies any notice requirement that may have applied under Section VII(c)(2) of the MSA. A copy of the letter is attached as Exhibit 3.

{¶ 11} "7. Before the pending motion was filed, R.J. Reynolds and the States attempted to resolve their dispute over this issue through discussions pursuant to Section VII(c)(6).

{¶ 12} "8. R.J. Reynolds currently uses matchbooks in three different ways. First, it purchases matchbooks that are distributed in bars, nightclubs, and lounges in connection with marketing campaigns for its Winston and Camel brands. Second, it purchases similar matchbooks for use at musical and sporting events. Third, R.J. Reynolds buys space on matchbooks from D.D. Bean & Sons Company in which it displays its Winston brand and related promotional messages.

{¶ 13} "9. In this enforcement proceeding, the State of Ohio challenges R.J. Reynolds' third use of matchbooks, its practice of causing the distribution of matchbooks bearing its tobacco brand names, as manufactured by D.D. Bean. The State contends that R.J. Reynolds' use of matchbooks bearing its brands violates the MSA prohibition on the use of 'apparel or other merchandise * * * which bears a Brand Name' as provided in Section III(f) of the MSA. The State does not now challenge the other ways in which R.J. Reynolds uses matchbooks (although it reserves the right to do so in the future) because some or all of those uses may fall within the exception in Section III(f)(5) of the MSA for merchandise used within an 'Adult–Only Facility.'

{¶ 14} "10. Each of these three types of matchbooks contains R.J. Reynolds brand names, logos, or other indicia of product identification, and they are distributed in Ohio.

{¶ 15} "11. R.J. Reynolds values matchbooks as a communications device because each matchbook allows it to deliver its message multiple times to a focused audience of adults who smoke cigarettes. R.J. Reynolds acknowledges that some of its matchbooks reach a broader audience, including non-smokers.

{¶ 16} "12. Although in the past R.J. Reynolds distributed promotional matchbooks (for example, in collectable tins) through catalogues, it has not done so since before July 1, 1999. A sample catalogue entry is attached as Exhibit 4.

{¶ 17} "13.  Since early last century, matchbooks have been used as a communications medium for commercial advertising and various non-commercial messages.

{¶ 18} "14.  D.D. Bean, currently the largest manufacturer of matchbooks in the United States, for a fee includes advertising and/or promotional messages on approximately half of the matchbooks that it produces.  The matchbooks on which space is sold for promotional messages are priced lower than D.D. Bean matchbooks on which space is not sold.  They are sold to wholesalers who generally distribute tobacco products as well, who, in turn, sell these matchbooks to retailers.  These retailers include tobacco specialty stores, convenience stores, grocery stores, gas stations, bars and liquor stores, and other retailers.  The parties agree that at the retail level, some D.D. Bean matchbooks containing R.J. Reynolds' content are given away at no additional charge with the purchase of tobacco products, but the parties do not agree about the quantity or the relative quantity distributed in this manner.  R.J. Reynolds contends that the vast majority of D.D. Bean matchbooks containing R.J. Reynolds' content are given away at no additional charge with the purchase of tobacco products.  However, the State of Ohio contends the relative quantity distributed in this manner is substantially fewer than a vast majority and that a significant number of D.D. Bean matchbooks bearing R.J. Reynolds brand are given away without the purchase of cigarettes.  Most paper matchbooks are used by adults to light cigarettes, although some are used for other purposes, including by non-smokers.

{¶ 19} "15.  Over the last sixty years, R.J. Reynolds has at times bought space on D.D. Bean matchbooks.  In the early 1990s, R.J. Reynolds and D.D. Bean agreed to contracts giving R.J. Reynolds the option of being the only tobacco company buying space on D.D. Bean matches.  Copies of such contracts are attached as Exhibits 5 through 9.

{¶ 20} "16.  The relationship between D.D. Bean and R.J. Reynolds is currently governed by a Matchbook Advertising Space Agreement executed in September 2000, and renewed and amended in December 2000, the term of which extends until December 31, 2002.  A copy of this agreement, as amended, is attached as Exhibit 10.  This agreement superseded an October 1, 1999 agreement, which in turn superseded a 1997 agreement.  Copies of these two agreements are attached as Exhibits 11 and 12 respectively.

{¶ 21} "17.  As was true under the prior agreements, under the September 2000 Matchbook Advertising Space Agreement, R.J. Reynolds pays D.D. Bean to print branded messages created by R.J. Reynolds on matchbooks that Bean manufacturers and distributes.  R.J. Reynolds does not acquire any ownership interest in those matchbooks.  In addition, R.J. Reynolds does not derive any revenue directly from the distribution of D.D. Bean matchbooks, but only from

whatever effect they may have in promoting the sale of R.J. Reynolds tobacco products.

{¶ 22} "18. Like the other paper matchbooks produced by D.D. Bean, the matchbooks with R.J. Reynolds content contain twenty matchsticks. The covers for these matchbooks are printed by a press that is more sophisticated than the other presses used by D.D. Bean and that is not used for other matchbooks. These covers also use different, higher quality paper stock with a different, higher quality ink, and they are treated with a coating not used for other matchbooks.

{¶ 23} "19. In addition to the matchbooks it makes for R.J. Reynolds, D.D. Bean manufacturers and sells other paper matchbooks. Some of these matchbooks are distributed for sale to the public in packages of 50, by retailers such as grocery and convenience stores, and they are generally sold without regard to the sale of tobacco products. These matchbooks, which are functionally equivalent, also contain twenty matchsticks and have no greater fire-starting quality than those made for R.J. Reynolds. An example of a box of matchbooks sold at grocery and convenience stores is attached as Exhibit 13. The parties plan to obtain a sample box of matchbooks manufactured by D.D. Bean and will submit it to the Court as a supplemental exhibit, if and when it is obtained.

{¶ 24} "20. R.J. Reynolds changes the design and content of the space it purchases on D.D. Bean matchbooks every three to six months. Each group of matchbooks printed by D.D. Bean contains up to thirty-six different designs. Since 1999, D.D. Bean has printed over 150 different matchbook covers for R.J. Reynolds.

{¶ 25} "21. These matchbooks contain artwork, pictures, and other graphics on the outside cover as well as logos, slogans, and other statements promoting R.J. Reynolds tobacco products. The matchbooks in use at the time of this stipulation contain the same colors, design, and graphics as Winston cigarette packs. A copy of this matchbook cover is attached as Exhibit 14.

{¶ 26} "22. The volume of D.D. Bean matchbooks containing R.J. Reynolds' design and content shipped to wholesalers, both nationwide and in Ohio, and thereafter distributed, are represented in the table attached as Exhibit 15. Some of the matchbooks shipped to wholesalers in Ohio may not have been distributed to retailers in Ohio, but some matchbooks may also have been distributed to retailers in Ohio by wholesalers located outside the State. Each case produced by D.D. Bean contains 2,500 matchbooks, which are packaged in boxes of 50.

{¶ 27} "23. Since before July 1, 1999, D.D. Bean matchbook covers containing R.J. Reynolds messages have stated 'Do Not Distribute these Matches or Tobacco Products to Minors' on their upper edge. *See, e.g.,* Exhibit 14. Since

before July 1, 1999, the wrappers on boxes of matchbooks have also stated that the matches are intended only for adults. Recently, in response to a request by R.J. Reynolds, D.D. Bean revised the statement on the wrappers to say that: 'These matches are to be distributed only to adults, at no extra charge with the purchase of tobacco products.' Reynolds' messages on wrappers are directed principally to distributors and retailers of matchbooks. A copy of the current wrapper is attached as Exhibit 16.

{¶ 28} "24. R.J. Reynolds has a times coordinated the design and content on D.D. Bean matchbook covers with the design and content of its cigarette advertising in the print media by, for example, using photographs, slogans and graphic art used in R.J. Reynolds' magazine advertising. Several of these covers are attached as Exhibit 17."

{¶ 29} In addition to the stipulated facts, the parties also submitted written memoranda to the trial court. On November 9, 2001, the trial court convened a hearing in which the parties sought to define "merchandise" for the court and to address whether the matchbooks are merchandise as contemplated by the MSA.

{¶ 30} In its decision and entry, the trial court first looked at various definitions the parties provided for the term "merchandise." The trial court concluded that a "comprehensive definition of such a term defies 21st century creativity." Attempting to synthesize the parties' various definitions, the trial court concluded that nearly all the cited definitions of merchandise include goods "bought and sold" or "held for sale" in a commercial setting either by a merchant or to a consumer. The trial court determined that a definition of "merchandise" means "goods, wares, commodities, finished articles, or wares held in temporary inventory by a merchant/business or which are bought and sold, wholesale, retail or in trade, in commerce, for profit." (Decision and Judgment Entry at 12.)

{¶ 31} The trial court then focused on the transactions by which the matchbooks eventually reached the consumer. First, RJR contracts with the manufacturer to print RJR advertising messages on paper matchbook covers, paying for the service. The trial court found this transaction fell outside the definition of merchandise, which was confined to finished goods.

{¶ 32} Second, the manufacturer prints the advertising messages on the paper matchbook covers, bundles the matchbooks into packages of 50 matchbooks, and sells them to wholesalers, mainly tobacco product distributors, who pay the manufacturer for the matchbooks. The trial court found this transaction pegged the matchbooks as merchandise.

{¶ 33} Third, wholesalers sell the matchbooks to retailers. The trial court found that this transaction also pegged the matchbooks as merchandise and the wholesalers as merchants.

{¶ 34} Fourth, the retailers give the matchbooks away free to purchasers of tobacco products. The trial court found that the free distribution of the matchbooks took them outside the definition of merchandise. The trial court further found that the purpose of the printed matchbooks is promotion and advertising.

{¶ 35} The state has appealed, assigning as error the following:

{¶ 36} "The court below erred in determining that matchbooks bearing tobacco product brand names are not merchandise pursuant to § III(f) of the Tobacco Master Settlement Agreement."

{¶ 37} The purpose of contract construction is to effectuate the intent of the parties. *Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, paragraph one of the syllabus. The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement. Id. The mere absence of a definition of a term in a contract does not make the term ambiguous. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. If a contract is clear and unambiguous, its interpretation is a matter of law and there is no issue of fact to be determined. Id.; *Latina v. Woodpath Dev. Co.* (1991), 57 Ohio St.3d 212, 214, 567 N.E.2d 262. Words will be given their ordinary meaning in a contract unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall contents of the instrument. *Shifrin v. Forest City Enterprises, Inc.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499. A court will consider extrinsic evidence only when the language of the contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning. A contract is ambiguous if it is susceptible of more than one reasonable interpretation. *See Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.* (1990), 52 Ohio St.3d 174, 556 N.E.2d 1186, syllabus.

{¶ 38} The test for determining whether a term is ambiguous is that common words in a written contract will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall content of the contract. *McConnell v. Hunt Sports Ent.* (1999), 132 Ohio App.3d 657, 675, 725 N.E.2d 1193; *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 54, 544 N.E.2d 920. A writing will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519. When read in context with the language of the ban contained in Section III(f) of the MSA and taken at its ordinary meaning, we conclude that the term "merchandise" is not ambiguous.

{¶ 39} Here, the issue for this court's consideration is essentially the same as that of the trial court. Since the MSA does not define "merchandise," this court must examine the plain and ordinary meaning of that term in conjunction with the facts to see whether the MSA, which prohibits the distribution of merchandise bearing the RJR brand names, encompasses matchbooks imprinted with those brand names and distributed for free to purchasers of tobacco products. See *Nationwide Mut. Fire Ins. Co.* at 109, 652 N.E.2d 684 (construing the undefined term "employee" in the context of an insurance contract exclusion).

{¶ 40} The state contends that the common understanding of the term merchandise includes brand-name matchbooks because they are tangible items, with a utilitarian value, that are bought and sold in commerce. The state further argues that the fact that the matchbooks are ultimately given away for free does not break the definitional chain and take them outside the purview of merchandise. We agree.

{¶ 41} Section III(f) of the MSA provides in part:

{¶ 42} *"Ban on Tobacco Brand Name Merchandise.* Beginning July 1, 1999, no Participating Manufacturer may, within any Settling State, market, distribute, offer, sell, license or cause to be marketed, distributed, offered, sold or licensed (including, without limitation, by catalogue or direct mail), any apparel or other merchandise (other than Tobacco Products, items the sole function of which is to advertise Tobacco Products, or written or electronic publications) which bears a Brand Name."

{¶ 43} We have no quarrel with the trial court's determination that merchandise includes goods bought and sold in a commercial setting either by a merchant or to a consumer. However, we do disagree with the conclusion that merchandise somehow loses its character as merchandise because it is subsequently offered for free as a promotional item. To find otherwise would eviscerate the ban on marketing and distribution of brand name apparel or other merchandise contained in the MSA.

{¶ 44} RJR contends that over the years there has developed in this country the "common understanding that paper matchbooks are an advertising item that is widely available to consumers without charge." (RJR brief at 6.) RJR concedes that articles do not cease to be merchandise under Section III(f) of the MSA just because RJR chooses to give them away. (RJR brief at 34.) Rather, according to RJR, the relevant inquiry is not just whether an item is given away but whether the articles are merchandise in the first place, and that question turns on whether they are articles that are typically or customarily sold to consumers at retail.

{¶ 45}  Assuming for the moment that RJR's thesis is correct, it is undisputed that billions of matchbooks are sold, not given, to consumers on an annual basis. The United States Consumer Product Safety Commission estimates that 80–90 percent of matchbooks produced annually are given free to consumers, and 12–20 percent of matchbooks are purchased at retail by consumers. Sections 1202.2(c)(3)(i) and (ii), Title 16, C.F.R. We do not believe that more than 50 percent of matchbooks must be sold at retail for them to qualify as merchandise. To find otherwise would open the door for tobacco companies to flood the market with free goods in order to circumvent the ban on distribution of apparel or other merchandise.

{¶ 46}  Nor does the historical advertising function of matchbooks take them outside the common understanding of the term "merchandise." While the trial court concluded, and RJR contends, that branded matchbooks are advertising, it is clear that advertising is not the sole function of the matchbooks, as their primary function to the consumer is as a source of fire. This means that functionally, matchbooks are no different from T-shirts or other items of apparel that sport a tobacco brand name and are banned by the MSA. While there is no question that matchbooks are widely distributed for advertising and promotional purposes, the fact that something is widely disseminated does not mean that it is not merchandise. It is equally possible to characterize the widespread distribution of free paper matchbooks as part of the tobacco culture the MSA seeks to curtail by banning branded merchandise.

{¶ 47}  For these reasons, RJR branded matchbooks meet the common understanding of the term "merchandise" and, therefore, Section III(f) of the MSA prohibits the distribution by RJR of the matchbooks imprinted with their brand names. As such, the state's assignment of error is sustained, we reverse the judgment of the Franklin County Court of Common Pleas, and we remand the matter to the trial court for further proceedings in accordance with this opinion.

Judgment reversed
and cause remanded
for further proceedings.

BOWMAN and PEGGY BRYANT, JJ., concur.